# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

## No. 23-5644

_____

### UNITED STATES OF AMERICA,

#### Plaintiff-Appellee

v.

### TRENTON LAYNE TAYLOR,

#### Defendant-Appellant

_____

**Appeal from the United States District Court
For the Eastern District of Kentucky at Frankfort
Criminal Action No. 3:22-cr-22-S
Hon. Gregory F. Van Tatenhove**

_____

## BRIEF FOR APPELLANT
_____

**ROBERT L. ABELL
120 North Upper St.
Lexington, KY 40507
859-254-7076
859-281-6541 Fax
Robert@RobertAbellLaw.com
COUNSEL FOR APPELLANT**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-5644

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

TRENTON LAYNE TAYLOR,

Defendant-Appellant

DISCLOSURE OF CORPORATE AFFILIATIONS
AND FINANCIAL INTERESTS

Pursuant to the Sixth Circuit Rule, 25 Defendant-Appellant Trenton Layne Taylor makes the following disclosures:

1.     Are any of the said parties a subsidiary or affiliate of a publicly owned corporation? RESPONSE: No.

2.     If the answer is YES, list below the identity of the parent corporation or affiliate and the relationship between it and the named party: RESPONSE:     See the Response above.

If the answer is YES, list the identity of such corporation and the nature of the financial interest: RESPONSE: See Response above.

/s/ Robert L. Abell
Robert L. Abell
Counsel for Appellant

ii

# Table of Contents

**Page #**

Table of Contents.........................................................................................iii

Table of Authorities.....................................................................................iv

Statement Regarding Oral Argument............................................................vi

Statement of Jurisdiction...............................................................................1

Statement of Issue Presented for Review.......................................................1

Statement of the Case....................................................................................1

Taylor's Motion to Dismiss............................................................................1

The District Court's Opinion and Order.........................................................4

Taylor's Conditional Plea..............................................................................5

Summary of Argument...................................................................................5

Argument.......................................................................................................6

      Point 1...................................................................................................6

      The Second Amendment Bars Taylor's Prosecution for Violating
      18 U.S.C. § 922(g)(1)

      (A)   Introduction...............................................................................6

      (B)   Taylor is among "the people" covered by the plain text of the
            Second Amendment.................................................................9

      (C)   *Bruen*'s historical test requires both that the government show
            a robust tradition of "distinctly similar" historical precursors to
            § 922(g)(1) and teaches that exceptions to the "the Second
            Amendment's 'unqualified command'" be narrowly drawn......15

(D)  Taylor wasn't convicted of the equivalent of common law burglary, that burglary is considered a violent crime is sometimes the case and sometimes not and that burglars were once subject to capital punishment does not establish a practice of permanently disarming them.................................................21

(E)  Felon in possession laws appeared in only the 20th century.....25

Conclusion..........................................................................................27

Certificate of Service..........................................................................27

Rule 32(a)(7)(B) Certificate of Compliance.......................................27

Addendum..............................................................................................A

## Table of Authorities

**Cases**                                                                                              **Page #**

*District of Columbia v. Heller*, 554 U.S. 570 (2008)...............8, 10, 12-14, 21

*James v. United States,* 550 U.S. 192 (2007)................................................23

*Kanter v. Barr,* 919 F.3d 437 (7th Cir. 2019)...........................13-14, 19-21, 26

*McDonald v. City of Chicago*, 561 U.S. 242 (2010).....................................12

*New York St. Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022).......*passim*

*Presser v. Illinois,* 116 U.S. 252 (1886)...........................................................18

*Range v. Attorney General*, 69 F.4th 96 (3rd Cir. 2023)(*en banc*)........*passim*

*Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014)...........................................3

*Solem v. Helm*, 463 U.S. 277 (1983)............................................................23

*Tennessee v. Garner*, 471 U.S. 1 (1985).......................................................23

*Tyler v. Hillsdale Co. Sheriff's Dept.*, 837 F.3d 678 (6th Cir. 2016) (*en banc*)........................................................................9, 11-12

*United States v. Bowers*, 594 F.3d 522 (6th Cir.), *cert. denied*, 562 U.S. 938 (2010).........................................................................9

*United States v. Bullock*, ___ F.Supp.3d ___, 2023 WL 4232309 (S.D. Miss., June 28, 2023).....................................7-8, 11, 19

*United States v. Burgess*, 2023 WL 179886 (6th Cir. 2023)..........................7

*United States v. Cruikshank*, 92 U.S. 542 (1875)........................................18

*United States v. Folajtar*, 980 F.3d 897, 912 (3rd Cir. 2020), *cert. denied*, 141 S.Ct. 2511 (2021)...........................................14, 21, 24

*United States v. Goins*, ____ F.Supp.3d _____,2022 WL 17836677 (E.D. Ky., Dec. 21, 2022).........................................4

*United States v. Greeno*, 679 F.3d 510 (6th Cir.), *cert. denied*, 568 U.S. 922 (2012)....................................................................6

*United States v. Jenkins*, 528 Fed.Appx. 483 (6th Cir.), *cert. denied*, 571 U.S. 980 (2013)...............................................................24

*United States v. Price*, ____ F.Supp.3d _____, 2022 WL 6968457 (S.D. W.Va., Oct. 12, 2022)....................................16

*United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir.), *cert. granted*, 143 S.Ct. 2688 (2023).........................................................6

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)..........................13

## Constitutional Provisions & Statutes

U.S. Const. amend. II................................................................*passim*

18 U.S.C. § 922....................................................................*passim*

18 U.S.C. § 924...............................................................5, 23-24

18 U.S.C. §3231.......................................................................................1

28 U.S.C. § 1291......................................................................................1

KRS 511.030......................................................................................22-23

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law:* The *Interpretation of Legal Texts* (2012)...........................................................................12

C. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009)..........................................................................10, 12, 26

C.K. Marshall, *Why Can't Martha Stewart Have a Gun?* 32 Harv. J.L & Pub. Pol'y 695 (2009).................................................................25

Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous,"* 25 Tex. Rev. L. & Pol. 245 (2021)..................................................25-26

R. Culp, P. Kopp, C. McCoy, *Is Burglary A Crime of Violence? An Analysis of National Data, 1998-2007*................................................23

W. LaFave & A. Scott, Substantive Criminal Law (1986)...........................22

W. Rawle, A View of the Constitution of the United States (1829)..............19

## Statement Regarding Oral Argument

The Second Amendment issue raised in this case warrants that oral argument be held. Accordingly, appellant respectfully requests that the Court hold oral argument.

## Statement of Jurisdiction

The United States District Court for the Eastern District of Kentucky had jurisdiction over this case, because appellant Trenton Layne Taylor was charged with crimes occurring in that district. 18 U.S.C. § 3231.

Taylor pleaded guilty conditionally to one charge of violating 18 U.S.C. § 922(g)(1)(felon in possession of a firearm), and the district court sentenced him to a term of 28 months imprisonment by judgment entered July 5, 2023. Judgment, R. 50, #216. [1] He appealed timely. Notice of Appeal, R. 51, #223. This Court has jurisdiction under 28 U.S.C. § 1291.

## Statement of Issues Presented for Review

Whether the Second Amendment bars Taylor's prosecution for violating 18 U.S.C. § 922(g)(1).

## Statement of the Case

The indictment charged Taylor with a single count of violating 18 U.S.C. § 922(g)(1). Indictment, R. 1, #1. A superseding indictment added two additional charges of violating 18 U.S.C. § 922(g)(1). Superseding Indictment, R. 17, #46.

### Taylor's Motion to Dismiss

---

[1] The citations are to the district court's docket number ("R") and the PageID number ("#").

Taylor moved to dismiss the superseding indictment on grounds that his prosecution for violating 18 U.S.C. § 922(g)(1) was barred by the Second Amendment based on the Supreme Court's decision in *New York St. Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022). Motion to Dismiss, R. 24, #60.

Taylor's prior felony convictions were in Kentucky state court, specifically in Carroll Circuit Court case no. 20-CR-23 to second-degree burglary (a Class C felony under Kentucky law) and receiving stolen property (a Class D felony).[2] These convictions made Taylor subject to prosecution for violating 18 U.S.C. § 922(g)(1).

These convictions resulted from an unusual scenario. More specifically, a dispute had arisen between Taylor's father regarding the ownership and/or alleged misuse of a trailer. Defendant's Memorandum Supporting Motion for Guidelines Variance and Sentencing Memorandum at 3, R. 46-1.[3] The trailer was once owned by Taylor's father, and he had allowed a cousin to take possession of it and move it onto the cousin's family farm. *Id*. That cousin passed untimely, and the trailer came to be occupied by the cousin's drug-abusing daughter and other deplorables. *Id.*

---

[2] A true copy of the Carroll Circuit Court's judgment was tendered as Ex. 1 to Taylor's memorandum of law supporting his motion to dismiss. R. 24-2, #81.

[3] This document is filed under seal in the record.

Taylor's father unsuccessfully sought assistance from the county attorney to get the trailer's occupants evicted. *Id.* One of the occupants had previously threatened Taylor's father. *Id.* at 4. On the day in question, Taylor learned that his father had gone to the trailer and, mindful of this previous and threatening correspondence from the occupant, went to the trailer's location. *Id.* Along with his agitated father, Taylor, then only 19 years old, did in fact enter the trailer. He pleaded guilty to second-degree burglary, a plea that well illustrates Judge Keith's observation that "[i]t is a troubling, yet undeniable, fact and reminds trial courts that innocent people plead guilty to crimes for which they are not guilty[.]" *Robertson v. Lucas*, 753 F.3d 606, 625 (6th Cir. 2014)(Keith, J., concurring).

Taylor's motion contended mainly that his prior felony convictions were non-violent and that our Nation's historical tradition of firearm regulation did not permit permanent disarming of felons, since felon-in-possession laws did not exist until the 20th century and over 100 years after the Second Amendment and the Bill of Rights were adopted in 1791. Memorandum Supporting Motion to Dismiss, R. 24-1, #76-79. Taylor argued also that his prior convictions were non-violent and the Nation's historical tradition of disarming non-violent felons was even weaker than with regard to felons generally. *Id.*

3

**The District Court's Opinion and Order**

The district court denied Taylor's motion to dismiss. Opinion & Order, R. 32, #128. The main basis for the court's ruling was that the Second Amendment incorporated "a deeply rooted English common law tradition" allowing Congress to disarm "those that it deems a danger to public safety." Opinion at 3; #130. The court relied upon its earlier decision in *United States v. Goins*, ____ F.3d ____, 2022 WL 17836677 (E.D. Ky., Dec. 21, 2022), and recited as exemplars of the English common law tradition, "the 14th Century Statute of Northampton," which prohibited Englishmen from forcefully disturbing the King's peace and even in the 17th century maintained some relevance; the Military Act of 1662 which empowered Crown officers to disarm anyone deemed "dangerous to the Peace of the Kingdom,"; and, the acts of Founding era, American legislatures that categorically disarm those judged a threat to public safety, including Native Americans, slaves and those whose loyalty to the English King was judged to still maintain. *Id*. at 3-4; #130-31. In sum, "[w]hile the Second Amendment creates a right to bear arms, its scope is limited by Congress's traditional power to disarm people that pose a threat to public safety." *Id*. at 4; #131. Furthermore, Congress may exercise modern judgments as to who does or does not pose a danger to public safety. *Id*.

The district court reasoned that Taylor could properly be deemed a "danger to the public" based on his second-degree burglary conviction. *Id.* at 5; #132. The court noted that burglary was defined as a violent felony by the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2)(B)(ii). *Id.* at 6; #133. The court below also rejected Taylor's contention that burglary was considered at common law a nonviolent property crime, because even if so, burglars were subjected to the death penalty at common law and even into the 19th century. *Id.* at 8-9; #135-36.

**Taylor's Conditional Plea**

Taylor and the United States entered a conditional plea agreement: he pleaded guilty to one count of violating 18 U.S.C. § 922(g)(1) and retained "the right to appeal the District Court's denial of his pretrial motion to dismiss." Conditional Plea Agreement, R. 37, #148.

## Summary of Argument

Taylor's prosecution for violating 18 U.S.C. § 922(g)(1) is barred by the Second Amendment. First, Taylor, notwithstanding his prior felony convictions, remains among "the people" covered by the Second Amendment. Second, our Nation's historical tradition of firearm regulation does not  reach Taylor for a number of reasons: (1) the court below's assertion that Congress may determine who does or does not constitute a

"danger to public safety" brushes with too broad a brush and thus grants Congress unreviewable power to manipulate the Second Amendment by choosing a label; (2) felon-in-possession laws did not appear until the 20th century and 18 U.S.C. § 922(g)(1) dates only to 1938; (3) Taylor's conviction was for second-degree burglary under Kentucky law and that modern offense would not constitute burglary at common law; (4) burglary at common law was considered a non-violent, property offense, as it is sometimes today; and, (5) there is no "distinctly similar" or even "relevantly similar" historical analogue that supports Taylor's prosecution for violating § 922(g)(1).

## Argument

## Point 1

### The Second Amendment Bars Taylor's Prosecution for Violating 18 U.S.C. § 922(g)(1)

**(A)    Introduction**

The Supreme Court's decision in *New York St. Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022) "clearly fundamentally changed [the] analysis of laws that implicate the Second Amendment[.]" *United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir.), *cert. granted*, 143 S.Ct. 2688 (2023). The Court repudiated in *Bruen* the two-step analysis adopted by this Court, *United States v. Greeno*, 679 F.3d 510 (6th Cir.), *cert. denied*,  568 U.S. 922 (2012),

6

and other circuits to evaluate Second Amendment challenges to firearm laws, labeling that "one step too many." *Bruen*, 142 S.Ct. at 2127; *United States v. Burgess*, 2023 WL 179886 *5 (6th Cir. 2023)(noting that *Bruen* had abrogated *Greeno*). Seeking to elevate the Second Amendment from second-class status, the Court held that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," in which case, the government must demonstrate that the law and its application, "is consistent with the Nation's historical tradition of firearm regulation."  142 S.Ct. at 2130. *Bruen*, in short, instituted a historical test regarding the constitutionality of Taylor's prosecution for violating 18 U.S.C. § 922(g)(1).

*Bruen* has generated substantial litigation regarding the constitutionality of 18 U.S.C. § 922. The vast majority of courts have held that *Bruen* does not affect the constitutional application of § 922(g)(1), as applied to persons with a prior or prior felony convictions. The two exceptions so far are the *en banc* Third Circuit in *Range v. Attorney General*, 69 F.4th 96 (3rd Cir. 2023), which held that the plaintiff's nearly 30-year-old conviction for filing a fraudulent claim for unemployment compensation could not support his permanent disarming. The other is the district court in *United States v. Bullock*, ___ F.Supp.3d ___, 2023 WL

4232309 (S.D. Miss., June 28, 2023), where the court dismissed a §

922(g)(1) prosecution against a defendant whose previous conviction was

for manslaughter.

The cases involving the constitutionality of § 922(g)(1) have turned,

by and large, on two issues. The first is whether a felon remains among "the

people" covered by the Second Amendment. A number of courts have held a

convicted felon is not among "the people" covered by the Second

Amendment, as the government will surely point out. These decisions

derive from the repeated dicta references and statements in the Supreme

Court's opinions in *District of Columbia v. Heller*, 554 U.S. 570, 626-27, n.

27, 635 (2008), to "law-abiding citizens" and "nothing in [its] opinion

should be taken to cast doubt" on certain "presumptively lawful regulatory

measures," such as "longstanding prohibitions on the possession of

firearms by felons and the mentally ill . . ."). *Bullock, supra*, 2023 WL at

*17.  Some have augmented their analysis by tallying "the felon-in-

possession votes implied by *Bruen*'s concurrences and dissent" wherein six

Justices, five of whom remain on the Court, endorsed felon disarmament.

*Bullock* at *19. These rulings short-circuit the historical analysis indicated

by *Bruen*, because if a convicted felon is not among "the people" covered by

the Second Amendment, the amendment's plain text does not apply to his conduct.

The second issue is whether our Nation's historical tradition of firearm regulation includes disarming one of "the people" on account of a felony conviction. *Bruen* established two tracks for considering this question depending on whether the point of regulation was an old one or new one or a new technology.

This Court reviews de novo the issue of whether the Second Amendment bars Taylor's prosecution for violating 18 U.S.C. § 922(g)(1). *United States v. Bowers,* 594 F.3d 522, 527 (6th Cir.), *cert. denied*, 562 U.S. 936 (2010).

**(B)  Taylor is among "the people" covered by the plain text of the Second Amendment**

The threshold issue is whether Taylor, notwithstanding his felony convictions, remains among "the people" covered by the Second Amendment. The Court should hold that he is. First, a contrary ruling would ignore the Second Amendment's plain text. Second, *Bruen*'s holding requires that the Court examine Taylor's conduct not his status. Third, this Court's *en banc* holding in *Tyler v. Hillsdale County Sheriff's Office*, 837 F.3d 678 (6th Cir. 2016), goes far in resolving that Taylor remains among "the people" covered by the Second Amendment. Finally, the phrase "the

9

people" appears in numerous places in the Constitution, and the Supreme Court has not indicated that "the people" referred to by the Second Amendment are different than "the people" covered by the First and/or Fourth Amendments or referred to elsewhere in the Constitution.

The Second Amendment provides as follows:

A well regulated Militia, being necessary to the security of a free State, *the right of the people* to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II.

The Second Amendment recognizes an individual right. "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Heller*, 554 U.S. at 595.

The text of the Second Amendment does not except those with any prior felony convictions or other civil disabilities. This absence is "echoed in state constitutional provisions" as "[o]nly one state constitutional provision addressing the right to bear arms contains an exception for felons[,]" this being Idaho's enacted in 1978. C. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1375 (2009)(Larson, *Four Exceptions*). "We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 581.

*Bruen* does not retreat from this point. *Bruen* held "that when the Second Amendment's plain-text covers and individual's conduct, the Constitution presumptively protects that conduct." 142 S.Ct. at 2126. This requires courts "to look at the 'conduct' being regulated, not the status of the person performing the conduct." *Bullock, supra* at *20.

This Court's decision in *Tyler, supra,* supports the conclusion that Taylor remains among "the people" covered by the Second Amendment and may raise this "as applied" challenge. *Tyler* involved an "as applied" challenge to 18 U.S.C. § 922(g)(4), which criminalizes firearm possession by an individual that "has been committed to a mental institution", as the plaintiff had some 30 years prior. The district court had dismissed the plaintiff's declaratory judgment action "relying on the *Heller*'s observation that prohibitions on the possession of firearms by the mentally ill were presumptively lawful and concluding that [the plaintiff] was not within the ambit of the Second Amendment as historically understood." 837 F.3d at 684.

The Court rejected this reasoning, held that the plaintiff could properly mount his "as applied" challenge to § 922(g)(4), and explained as follows:

> While we "are obligated to follow Supreme Court
> dicta," *Heller* only established a presumption that such bans
> were lawful; it did not invite courts onto an analytical off-ramp
> to avoid constitutional analysis. A presumption implies "that
> there must exist the possibility that the ban could be
> unconstitutional in the face of an as-applied challenge."

837 F.3d at 686 (citations omitted).

The Court also noted "§ 922(g)(4)'s lack of historical pedigree," noted

that it "was not enacted until 1968" and *Heller*'s "command" that "historical

evidence [determined] the scope of the Second Amendment." *Id*. at 687.

Section 922(g)(1)'s historical pedigree dates only to 1938. *Id*. at 708

(Sutton, J., concurring). More generally, felon-in-possession laws did not

exist until the 20th century. "[S]tate laws prohibiting felons from possessing

firearms or denying firearms license to felons date from the early part of the

twentieth century" Larson, *Four Exceptions*, 60 Hastings L.J. at 1376.

The *en banc* Third Circuit in *Range v. Attorney General,* 69 F.4th 96

(3rd Cir. 2023), held that the dicta in *Bruen*, *Heller* and/or the Supreme

Court's other relatively recent Second Amendment case, *McDonald v. City

of Chicago,* 561 U.S. 242 (2010), did not remove a felon from "the people"

covered by the Second Amendment. The Third Circuit first relied upon the

presumption of consistent usage which posits that "[a] word or phrase is

presumed to bear the same meaning throughout a text." Antonin Scalia &

Bryan A. Garner, *Reading Law:* The *Interpretation of Legal Texts* 170

(2012). In *Heller*, the Court quoted a prior case that emphasized the common meaning of "the people" referenced in the First, Second, Fourth, Ninth and Tenth Amendments:

> " '[T]he people' seems to have been a term of art employed in select parts of the Constitution .... [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."

554 U.S. at 580, *quoting United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).

The Third Circuit recited that the Constitution referred to "the people" twice with respect to voting for Congress, and that "the people" also enjoy rights to assemble peaceably, to petition the government for redress and to be protected against unreasonable searches and seizures. 69 F.4th at 101. The Third Circuit found "no reason to adopt an inconsistent reading of 'the people'" and noted *Heller*'s remarks quoted-above pointed toward a consistent reading of "the people." *Id.* at 102.

Second, the Third Circuit noted and agreed with "then-Judge Barrett's dissenting opinion in *Kanter v. Barr*, in which she persuasively explained that 'all people have the right to keep and bear arms,' though the

13

legislature may constitutionally 'strip certain groups of that right.'" 919 F.3d 437, 452 (7th Cir. 2019).

Third, the Third Circuit analyzed "the phrase 'law-abiding, responsible citizens'" and condemned it "as expansive at it is vague." 69 F.4th at 102. As regards law-abiding citizens, the Third Circuit was confident that "the Supreme Court's references to 'law-abiding, responsible citizens' do not mean that every American who gets a traffic ticket" is removed from "the people" covered by the Second Amendment. *Id*. Quite right that surely is.

Finally, the Third Circuit observed that holding that "only 'law-abiding, responsible citizens' are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from 'the people.'" *Id*. at 102.  That result was untenable for two reasons: (1) it would grant "'legislatures unreviewable power to manipulate the Second Amendment by choosing a label.'" 69 F.4th at 102-03, *quoting United States v. Folajtar*, 980 F.3d 897, 912 (3rd Cir. 2020), *cert. denied*, 141 S.Ct. 2511 (2021)(Bubas, J., dissenting); and, (2) it "would contravene *Heller*'s reasoning that 'the enshrinement of constitutional rights necessarily takes certain policy choices off the table.'" 69 F.4th at 103, *quoting Heller*, 554 U.S. at 636.

The Court should conclude that Taylor remains among "the people" covered by the Second Amendment notwithstanding his prior felony convictions.

**(C)** ***Bruen*'s historical test requires both that the government show a robust tradition of "distinctly similar" historical precursors to § 922(g)(1) and teaches that exceptions to the "the Second Amendment's 'unqualified command'" be narrowly drawn**

Since Taylor is among "the people" covered by the Second Amendment, the government must demonstrate to rebut the presumption of unconstitutionality that § 922(g)(1) as applied to him "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130. The nature of that burden varies depending on what kind of problem a statute is designed to address; more specifically, whether the problem is old or new.

In "some cases," where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry is "fairly straightforward." *Id.* at 2131. The government must identify a robust tradition of "distinctly similar" Founding-era regulations. *Id.* If "the Founders themselves could have adopted" a particular regulation "to confront [a long-standing] problem," but did not do so, that is evidence the statute is unconstitutional today. *Id.* This is also true if some jurisdictions in the Founding era attempted to enact analogous regulations

but those proposals were rejected on constitutional grounds. *Id*. Both the *Heller* and *Bruen* cases were in this category: the laws at issue in those cases and at a problem – "handgun violence, primarily in urban areas" – that existed at the Founding, and the Court accordingly required a tight fit between those laws and historical precursors. *Id*.; *see also United States v. Price*, ____ F.Supp.3d _____, 2022 WL 6968457 (S.D. W.Va., Oct. 12, 2022)(explaining 18 U.S.C. § 922(k)'s restriction on firearms with obliterated serial numbers addresses long-standing societal problem of "crime").

A looser and "more nuanced approached" applies to regulations "implicating unprecedented societal concerns or dramatic technological changes" are addressing a problem that was "unimaginable at the founding." *Bruen*, 142 S.Ct. at 2132. The "central considerations" in the "relevantly similar" analysis are two: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the "how"]; and, (2) whether that burden is comparably justified [i.e., the "why"]." *Id*. at 2132-33.

These different approaches require courts faced with a *Bruen* challenge to identify as a threshold matter the problem at which a statute is aimed, and then determine whether that problem existed in 1791, when the

Second Amendment was adopted, or, instead, grows out of "unprecedented," "unimaginable" societal changes. *Id.* at 2132. 18 U.S.C. § 922(g)(1) is aimed at felons' access to firearms, or, more generally stated, crime, both of which have posed a (potential) problem since long before 1791, when the Second Amendment was adopted.  Accordingly, the question is whether § 922(g)(1) is "distinctly similar" to some substantial body of laws extant in and around the Founding era.

*Bruen* did not define "distinctly similar," but its analysis indicated a stringent standard. The only historical regulation *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person … any pistol … unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Id.* at 2153, *citing* 1871 Tex. Gen. Laws § 1. The Court acknowledged that the Texas statute was sufficiently analogous to provide historical support for New York's law. *Id.* at 2153. But the Court found only one other state had adopted a similar law before 1900 and concluded these few examples could not establish a historical tradition robust enough to allow New York's law to pass Second Amendment scrutiny. *Id.* The takeaway from this analysis is that, in a challenge to § 922(g)(1), a "distinctly similar" regulation would be one that either substantially

abridged felons' right to keep and bear arms, or permanently denied firearms to some group very similar to felons (e.g., those convicted of some subset of especially serious crimes).

The district court referred to laws applicable to subjects of the English King and some early American laws disarming Native Americans, slaves and Crown loyalists as establishing a traditional Congressional power to disarm individuals for posing a threat to public safety. Opinion at 3-4; #130-31. These laws established a "traditional power" (and it must be said, atextual) for Congress to disarm individuals judged by it to "pose a threat to public safety." *Id.* at 4; # 131. This conclusion cannot be squared with *Bruen*'s requirement for a robust historical tradition of "distinctly similar" regulations.

First, the Supreme Court twice stated explicitly in decisions after the Civil War that the Second Amendment barred Congress from the field of firearm regulation, which was a matter for the states. *United States v. Cruikshank*, 92 U.S. 542, 553 (1875)("The second amendment declares that [the right to keep and bear arms] shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress."); *Presser v. Illinois*, 116 U.S. 252, 265 (1886)(the Second Amendment "is a limitation only upon the power of Congress and the national government

and not upon that of the states."). A constitutional law treatise published in 1829 offered that "[n]o clause in the Constitution could by any rule of construction be conceived to give Congress a power to disarm the people." *Range*, 69 F.4th at 107 (Porter, J., concurring), *quoting* W. Rawle, <u>A View of the Constitution of the United States of America</u>. These authorities do not support the district court's assertion that a "traditional power" was imputed to Congress in and around 1791 to define the scope of the Second Amendment.

Second, many courts have considered deliberations at the constitutional ratifying conventions in Massachusetts, Pennsylvania, and New Hampshire as informing the scope of the Second Amendment. *Bullock, supra*, at *21-22. All three conventions considered "limiting language" on the right to keep and bear arms "arguably tied to criminality." *Kanter v. Barr*, Judge Barrett dissenting, 919 F.3d at 454. None of these proposals "made its way into the Second Amendment." *Id.* at 455. Now Justice Barrett examined the three her *Kanter v. Barr* dissent.

New Hampshire's proposed to disarm "those citizens who 'are or have been in actual rebellion.'" *Id.* (citation omitted). Obviously, "while this proposal reflects support for disarming rebels, it does not say anything

about disarming those who have committed other crimes, much less nonviolent ones." *Id.*

The Massachusetts convention considered a proposal that would have limited the right to "peaceable citizens," which meant, it appears, causing a public disturbance. *Id.* at 455-56. Given that "[n]ot all crimes are violent" and that "every non-peaceable person [is not] a criminal," the "phrase 'peaceable citizens' was not a synonym for 'non-felons' or even 'non-criminals.'" *Id.* at 456.

Pennsylvania's minority proposed to guarantee the right to bear arms "unless for crimes committed, or real danger of public injury from individuals." *Id.* This language, had it made it into the Second Amendment, would make this an easy case. However, it did not even carry the convention. *Id.* at 455.

Justice Barrett also examined in her *Kanter v. Barr* dissent the English laws refenced by the district court as well as those of colonial and early America. *Id.* at 457-458. She concluded: "neither the convention proposals nor historical practice supports a legislative power to categorically disarm felons because of their status as felons." *Id.* at 458. Put another way and contrary to the district court's conclusion, neither the convention proposals nor historical practice supports a Congressional

power to categorically disarm felons because of their status as felons as does § 922(g)(1). Further, neither the convention proposals nor historical practice shows either a "distinctly similar" or "relevantly similar" history of firearm regulation as imposed on Taylor by § 922(g)(1).

Third, the district court's conclusion that Congress possesses a "traditional power to disarm people that pose a threat to public safety" would threaten to devour the Second Amendment. This broad-brush description of Congressional power would grant it "unreviewable power to manipulate the Second Amendment by choosing a label.'" *Range*, 69 F.4th at 102-03, *quoting United States v. Folajtar*, 980 F.3d 897, 912 (3rd Cir. 2020), *cert. denied*, 141 S.Ct. 2511 (2021)(Bubas, J., dissenting). This degree of legislative deference "would contravene *Heller*'s reasoning that 'the enshrinement of constitutional rights necessarily takes certain policy choices off the table.'" *Range, supra*, *quoting Heller,* 554 U.S. at 636; *see also Bruen*, 142 S.Ct. at 2131 (warning against "judicial deference to legislative interest balancing"). Accordingly, Taylor's prosecution for violating § 922(g)(1) cannot be sustained as an example of an atextual but traditional power of Congress to disarm those judged a public safety threat.

**(D)    Taylor wasn't convicted of the equivalent of common law burglary, that burglary is considered a violent crime is sometimes the case and sometimes not and that burglars were**

**once subject to capital punishment does not establish a practice of permanently disarming them**

Beyond its assertion of Congress's "traditional power" to disarm those judged a public safety threat, the district court offered that the Second Amendment offered Taylor no protection from § 922(g)(1), because burglary, at least at times, has been referred to as a violent crime and violent criminals can be disarmed. Alternatively or further, the district court reasoned that since burglars were subjected to capital punishment until well into the 19th century, the lesser penalty of permanent disarmament could surely have been imposed. These points too fail to establish a "distinctly similar" historical practice of disarming felons such as Taylor.

First, Taylor's conviction for second-degree burglary is distinguishable from the common law crime of burglary. "Burglary was defined by the common law to be the breaking and entering of the dwelling house of another in the nighttime with the intent to commit a felony." *Taylor v. United States*, 495 U.S. 575, 580, n.3 110 S. Ct. 2143, 2149, 109 L. Ed. 2d 607 (1990), *quoting* W. LaFave & A. Scott, Substantive Criminal Law § 8.13, p. 464 (1986) (LaFave & Scott). As the court below noted, Opinion at 5; # 132, under Kentucky law, "[a] person is guilty of burglary in the second degree when, with the intent to commit a crime, he or she knowingly enters

or remains unlawfully in a dwelling." *Id.*, *quoting* KRS § 511.030(1). The elements are different: second degree burglary, unlike common law burglary, does not require breaking and entering, can occur either during day or nighttime and the culpable intent regards "a crime" as opposed to "a felony."

Second, burglary was "[t]raditionally considered an offense committed against the property of another[.]" R. Culp, P. Kopp, C. McCoy, *Is Burglary A Crime of Violence? An Analysis of National Data, 1998-2007* at vii.[4] Taylor's second-degree burglary conviction would not be classified as a crime of violence under U.S.S.G. § 4B1.2(a), and the FBI's Uniform Crime Reporting program (UCR) classifies burglary not as a violent crime but as a property crime. Exhibit; R. 24-3; #86. For its part, the Supreme Court has sometimes defined burglary as nonviolent, *Solem v. Helm*, 463 U.S. 277, 279 (1983) and *Tennessee v. Garner*, 471 U.S. 1, 21-22 (1985), and sometimes as violent for purposes of the Armed Career Criminal Act, *Taylor v. United States*, 495 U.S. 575, 587-98 (1990) and *James v. United States*, 550 U.S. 192 (2007). This Court has identified second-degree

---

[4] This report, which was funded by the Justice Department's National Institute of Justice is accessible at https://nij.ojp.gov/library/publications/burglary-crime-violence-analysis-national-data-1998-2007 (last accessed September 27, 2023).

burglary under Kentucky law as a "violent felony" for purposes of the
ACCA. *United States v. Jenkins*, 528 Fed.Appx. 483, 484-85 (6th Cir.), *cert.
denied*, 571 U.S. 980 (2013)(also noting that second-degree burglary under
Kentucky law remained distinguishable from common law burglary). There
is no indication that Taylor's second-degree burglary involved any use of
physical force or threat thereof against another person.

    The problem with deferring to Congress's labeling of "burglary" as a
violent felony for purposes of the ACCA and, by extension, constituting a
prior conviction justifying Taylor's permanent disarmament is that, as
observed in Range, would grant "'legislatures unreviewable power to
manipulate the Second Amendment by choosing a label.'" 69 F.4th at 102-
03, *quoting United States v. Folajtar*, 980 F.3d 897, 912 (3rd Cir. 2020),
*cert. denied*, 141 S.Ct. 2511 (2021)(Bubas, J., dissenting). The definitions of
the ACCA cannot establish a historical tradition of "distinctly similar"
firearm regulations to remove the Taylor's Second Amendment protection
against prosecution under § 922(g).

    The district court, while equivocating as to whether burglary or was
not considered a violent crime, did assert that burglars were subject to the
death penalty into the 19th century, Opinion at 7-9; #134-36, and, therefore,

could be subjected to the lesser penalty of disarmament. *Id*. This analysis was rejected rightly by the *en banc* Third Circuit in *Range*.

The imposition of the death penalty for some nonviolent crimes, such as horse theft and forgery, by Founding-era governments "does not suggest that the particular (and distinct) punishment at issue – lifetime disarmament – is rooted in our Nation's history and tradition." *Range*, 69 F.4th at 105. "The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted for certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Id*. Accordingly, the district court's assertion that burglars were executed even into the 19th century establishes neither a "distinctly similar" nor a "relevantly similar" historical analog. *Id*.

**(E)    Felon in possession laws appeared in only the 20th century**

The district court did not and could not cite any such laws from the Founding era, because none exist. Statutes prohibiting felons from possessing firearms did not appear until the 20th century. "[O]ne can with a good degree of confidence say that bans on convicting possessing firearms was unknown before World War I." C.K. Marshall, *Why Can't Martha Stewart Have a Gun?* 32 Harv. J.L & Pub. Pol'y 695, 708 (2009); Royce de

R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous*," 25 Tex. Rev. L. & Pol. 245, 291 (2021) (noting the lack of "any direct authority whatsoever" for the view that felons were "deprived of firearm rights" at the Founding).

Founding-era laws, statutes or ordinances prohibiting felons from possessing firearms would be the best evidence of a "historical tradition of firearm regulation" consistent with § 922(g)(1), but "scholars have not been able to identify any such laws." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 209)(Barrett, J., dissenting). "[N]o colonial or state law in eighteenth century America formally restricted the ability to own firearms." Larson, *Four Exceptions,* 60 Hastings L.J. at 1374. "In sum, felon disarmament laws significantly postdated both the Second Amendment and the Fourteenth Amendment." *Id*. at 1376.

Felon in possession laws like § 922(g)(1) are creations of the 20th century; they are not part of our Nation's historical tradition of firearm regulation. Moreover, there are no "distinctly similar" to § 922(g)(1), as applied to Taylor, firearm laws or regulations that are part of our Nation's tradition of firearm regulation. The court below erred in ruling otherwise.

**Conclusion**

For all the foregoing reasons, the judgment of the district court

should be vacated and reversed and the indictment ordered dismissed.

Respectfully Submitted,

By: /s/ Robert L. Abell
ROBERT L. ABELL
120 North Upper Street
Lexington, KY 40507
COUNSEL FOR APPELLLANT
TRENTON LAYNE TAYLOR

**Certificate of Service**

I hereby certify that the foregoing was electronically filed with the
Sixth Circuit's electronic filing system this 27th day of September 2023, that
notice will be sent electronically by that system to All Counsel of Record.

/s/ Robert L. Abell
COUNSEL FOR APPELLANT

**Certification of Compliance
Pursuant to FRAP 32(a)(7)(B)**

1. This brief complies with the type-volume limitation of
Fed.R.App.P. 32(a)(7)(B) because this brief contains 5,599 words,
excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

/s/ Robert L. Abell
COUNSEL FOR APPELLANT

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-5644

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

TRENTON LAYNE TAYLOR,

Defendant-Appellant

---

Appeal from the United States District Court
For the Eastern District of Kentucky at Frankfort
Criminal Action No. 3:22-cr-22-S
Hon. Gregory F. Van Tatenhove

---

DESIGNATION OF DISTRICT COURT DOCUMENTS
PURSUANT TO 6 CIR. R. 30

---

| Description of Documents | Record Entry # | Page ID# |
|---|---|---|
| Indictment | 1 | 1 |
| Superseding Indictment | 17 | 146 |
| Judgment | 50 | 216 |
| Notice of Appeal | 51 | 223 |
| Motion to Dismiss | 24 | 60 |
| Memorandum Supporting Motion to Dismiss | 24-1 | 62 |

A

| | | |
|---|---|---|
| Opinion & Order | 32 | 128 |
| Memorandum Supporting Motion for Guidelines Variance and Sentencing Memorandum | 46-1 | sealed |
| Exhibit (Carroll Circuit judgment) | 24-2 | 81 |
| Exhibit (FBI UCR report) | 24-3 | 86 |

## Counsel's Certification

I hereby certify that the foregoing documents are included in the district court's electronic record.

/s/ Robert L. Abell
Counsel for Appellant