CASE NO. 23-5644

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA                    PLAINTIFF-APPELLEE

V.

TRENTON LAYNE TAYLOR                    DEFENDANT-APPELLANT

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

_____

BRIEF OF THE PLAINTIFF-APPELLEE
UNITED STATES OF AMERICA

_____

CARLTON S. SHIER, IV
UNITED STATES ATTORNEY

CHARLES P. WISDOM JR.
CHIEF, APPELLATE DIVISION

BY:   AMANDA HARRIS HUANG
ASSISTANT UNITED STATES ATTORNEY
260 W. VINE STREET, SUITE 300
LEXINGTON, KENTUCKY 40507-1612
(859) 685-4874
Amanda.HarrisHuang@usdoj.gov

COUNSEL FOR PLAINTIFF-APPELLEE

# TABLE OF CONTENTS

Table of Authorities ................................................................................. ii

Statement Regarding Oral Argument ....................................................... xv

Statement of the Issues............................................................................. 1

Statement of the Case............................................................................... 1

Summary of the Argument........................................................................ 2

Argument................................................................................................... 4

Conclusion ................................................................................................ 38

Certificate of Compliance

Certificate of Service

Designation of District Court Documents

# TABLE OF AUTHORITIES

## I. Cases

*ACLU of Ky. v. McCreary Cnty., Ky.*,
   607 F.3d 439 (6th Cir. 2010) ..................................................................9

*Barrett v. United States*,
   423 U.S. 212 (1976) .............................................................................33

*Baze v. Rees*,
   553 U.S. 35 (2008) .......................................................................... 20-21

*Dickerson v. New Banner Institute, Inc.*,
   460 U.S. 103 (1983) .............................................................................33

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) .....................................................................*passim*

*James v. United States*,
   550 U.S. 192 (2007) ..............................................................................36

*Kanter v. Barr*,
   919 F.3d 437 (7th Cir. 2019) ...............................................................23

*Lewis v. United States*,
   445 U.S. 55 (1980) ...............................................................................33

*McDonald v. City of Chicago, Ill.*,
   561 U.S. 742 (2010) ..............................................................................17

*Medina v. Whitaker*,
   913 F.3d 152 (D.C. Cir. 2019) .............................................................20

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
   597 U.S. 1 (2022) .........................................................................*passim*

*Patterson v. Winn*,
    30 U.S. (5 Pet.) 233, 241 (1831) ........................................................... 26

*Range v. Attny Gen.*,
    69 F.4th 96 (3d Cir. 2023) ............................................................. 37-38

*Respublica v. Donagan*,
    2 Yeates 437 (Pa. 1799) ........................................................................ 29

*Richardson v. Ramirez*,
    418 U.S. 24 (1974) ................................................................................ 14

*Robertson v. Baldwin*,
    165 U.S. 275 (1897) .............................................................................. 13

*Spencer v. Kemna*,
    523 U.S. 1 (1998) .................................................................................. 15

*State v. Davis*,
    5 S.C.L. (3 Brev.) 3, 4 (S.C. Const. Ct. App. 1811) ............................ 29

*State v. Hogan*,
    58 N.E. 572 (Ohio 1900) ..................................................................... 32

*State v. Shelby*,
    2 S.W. 468 (Mo. 1886) ........................................................................ 32

*Tennessee v. Garner*,
    471 U.S. 1 (1985) .................................................................................. 20

*Timmreck v. United States*,
    577 F.2d 372 (6th Cir. 1978) ............................................................... 12

*Tyler v. Hillsdale Cty. Sherriff's Dept.*,
    837 F.3d 678 (6th Cir. 2016) ............................................................... 16

*United States v. Alaniz*,
    69 F.4th 1124 (9th Cir. 2023) .............................................................. 18

*United States v. Blackwell-Esters*,
   No. 22-cr-20287, 2023 WL 7093806 (E.D. Mich. Oct. 26, 2023) ...................... 11

*United States v. Brown*,
   No. 22-cr-704, 2023 WL 7323335 (N.D. Ohio Nov. 7, 2023) ........................... 10

*United States v. Carey*,
   602 F.3d 738 (6th Cir. 2010) .................................................... 3, 5-6, 9

*United States v. Carter*,
   No. 22-cr-20477, 2023 WL 3319913 (E.D. Mich. May 9, 2023)........................ 11

*United States v. Coombes*,
   629 F. Supp.3d 1149 (N.D. Ok. 2022)............................................... 37

*United States v. Deryke*,
   No. 23-cr-92, 2023 WL 7101902 (W.D. Mich. Oct. 27, 2023).................... 10-11

*United States v. Frazier*,
   314 F. App'x 801 (6th Cir. 2008) ................................................. 5-6, 9

*United States v. Gleaves*,
   — F. Supp. 3d —, 2023 WL 1791866 (M.D. Tenn. Feb. 6, 2023) .................... 11

*United States v. Goolsby*,
   No. 21-3087, 2022 WL 670137 (6th Cir. Mar. 7, 2022) ....................... 7

*United States v. Goins*,
   647 F. Supp.3d 538 (E.D. Ky. 2022) .........................................5, 9, 36

*United States v. Greeno*,
   679 F.3d 510 (6th Cir. 2012) ................................................. 9-10

*United States v. Griffin*,
   476 F. App'x 592 (6th Cir. 2011) ...............................................7

*United States v. Jimenez-Shilon*,
   34 F.4th 1042 (11th Cir. 2022) .................................................17

iv

*United States v. Kelly*,
  No. 22-CR-37, 2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ......................35

*United States v. Khami*,
  362 F. App'x 501 (6th Cir. 2010) ....................................................................7, 9

*United States v. Loney*,
  331 F.3d 516 (6th Cir. 2003) ...............................................................................6

*United States v. McNeil*,
  No. 23-cr-20229, 2023 WL 6627972 (E.D. Mich. Oct. 11, 2023) ....................11

*United States v. Miller*,
  No. 22-cr-645, 2023 WL 6065116 (N.D. Ohio Sept. 18, 2023)..........................11

*United States v. Nailor*,
  No. 23-cr-20076, 2023 WL 6049746 (E.D. Mich. Sept. 15, 2023)....................11

*United States v. Napier*,
  233 F.3d 394 (6th Cir. 2000) ...............................................................................7

*United States v. Nelson*,
  — F. Supp. 3d —, 2023 WL 4249367 (E.D. Mich. June 29, 2023)....................11

*United States v. Noble*,
  762 F.3d 509 (6th Cir. 2014) ...............................................................................9

*United States v. Omar*,
  No. 22-cr-182, 2023 WL 7526045 (S.D. Ohio Nov. 14, 2023)..........................10

*United States v. Parker*,
  No. 22-cr-82, 2023 WL 3690247 (W.D. Ky. May 26, 2023)..............................11

*United States v. Ross*,
  No. 23-cr-20168, 2023 WL 7345908 (E.D. Mich. Nov. 7, 2023) ......................10

*United States v. Smith*,
  No. 22-cr-20351, 2023 WL 2215779 (E.D. Mich. Feb. 24, 2023)......................11

*United States v. Taylor*,
  No. 23-cr-289, 2023 WL 5957107 (N.D. Ohio Sept. 12, 2023) ...........................11

*United States v. Vaughn*,
  No. 23-5790, 2023 U.S. App. LEXIS 25818 (6th Cir. Sept. 28, 2023) ......... 11-12

*United States v. Verdugo-Urquidez*,
  494 U.S. 259, 265 (1990) ...........................................................................15

*United States v. Whisnant*,
  391 F. App'x 426 (6th Cir. 2010) ........................................................ 6-7

*Vincent v. Garland*,
  80 F.4th 1197 (10th Cir. 2023) ...............................................................12

*Voisine v. United States*,
  579 U.S. 688 (2016) ...................................................................................14

*Ware v. United States*,
  55 F. App'x 351 (6th Cir. 2003) ................................................................4

## II.  Constitutional Provisions

U.S. Const. Pmbl ...........................................................................................15

U.S. Const. amend. II ....................................................................................4

U.S. Const. amend. X .....................................................................................16

U.S. Const. Amend. XIV, § 2 .........................................................................14

U.S. Const. amend. XVII, Cls. 1-2 .................................................................15

U.S. Const. art. I, § 2, cl. 1 ...........................................................................15

## III.  Statutes & Guidelines

18 U.S.C. § 922(g) .........................................................................................33

18 U.S.C. § 922(g)(1) .........................................................................*passim*

18 U.S.C. § 922(g)(4) ........................................................................16

18 U.S.C. § 922(g)(5) ........................................................................14

18 U.S.C. § 922(g)(7) ........................................................................14

18 U.S.C. § 924(e) .............................................................................37

U.S.S.G. § 2D1.1(b)(1) ......................................................................9

## IV.  Other Authorities

1 Richard Burn, *The Justice of the Peace, and Parish Officer* (2d ed. 1756) .........25

1 William Hawkins, A Treatise of the Pleas of the Crown 135 (1716)...................25

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) ........27

2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756) ...............................................................................25

3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890 (1833) ...............................................................................................13

4 *Journals of the Continental Congress* 1774-1789 (Worthington Chauncey Ford ed., 1906)...........................................................................................22

4 William Blackstone, *Commentaries on the Laws of England* (1st ed. 1769)...............................................................................20, 29

4 William Blackstone, *Commentaries on the Laws of England* (10th ed. 1787) .................................................................................25

6 *Documentary History* (John P. Kaminski & Gaspare J. Saladino eds., 2000)..........................................................................................27

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ..........14

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014) ..................................................................21

*Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700–8 March, 1702* (Feb. 26, 1701) (Edward Bateson ed., 1937) ....................24

David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354 (1982) ........................22

Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397 (2019) ......................................................................................24

Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* (2d ed. 1792) ......26

G. Jacob, *Lex Constitutionis* (2d ed. 1737)............................................................25

Giles Jacob, *The Modern Justice* (1716) ...............................................................24

James Davis, *The Office and Authority of a Justice of Peace* (1774) ....................26

James Parker, *Conductor Generalis* (1764)............................................................26

James Parker, *Conductor Generalis* (Robert Campbell printing 1792) .................26

James Parker, *Conductor Generalis* (Robert Hodge printing 1788) ......................26

John Holmes, *The Statesman, or Principles of Legislation and Law* (1840)..........28

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) .............................23

Joseph Gales, *Prevention of Crime*, *in* O.H. Smith, *Early Indiana Trials and Sketches* (1858) ...................................................................................28

Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* (1773)...................................................................................26

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (1994)................................................................25

Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 *Documentary History* (John P. Kaminski & Gaspare J. Saladino eds., 2001) .....27

Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* (1897) ...........................................................................24

Order of Council to Lord Lieutenants (Sept. 5, 1745), in Historical Manuscripts Commission, Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk (1905) ..........................................24

Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV* (1885) ........................................24

Randolph Roth, *Why Guns Are and Are Not the Problem*, *in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (2019) ...........................................30

Robert Gardiner, *The Compleat Constable* (3d ed. 1708) ......................................24

*State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842 ...............................................................................28

Stuart Banner, *The Death Penalty: An American History* (2002) ..........................21

Tapping Reeve, *The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of Chancery* (New Haven, Oliver Steele 1816) ........................................................29

Theodore Barlow, *The Justice of Peace* (1745)......................................................25

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868).....................15

W. Nelson, *The Office and Authority of a Justice of Peace* (7th ed. 1721)....... 24-25

William Waller Hening, *The New Virginia Justice* 18 (1795) ...............................26

## V. Historical Statutes

1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879)..................................... 31-32

1 *The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* (1811) ...........................21

1 W. & M. Sess. II, c. 2 (1688) (Eng.)............................................................... 23-24

1702 Conn. Acts 91...................................................................................................29

2 Edw. 3, c. 3 (1328) (Eng.)....................................................................................25

2 *Laws of the State of New York Passed at the Sessions of the Legislature* (1785-1788) ...................................................................................................................21

9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* (1821)...................................21

*Act About Binding to the Peace*, ch, 26, 1700 Pa. Laws 5......................................29

*Act About Binding to the Peace*, ch. 4, 1700 Del. Laws 52....................................29

*Act Declaring the Mode of Proceeding in Certain Criminal Cases*, ch. 30, § 16, 1789 Va. Laws 17-18............................................................................................29

Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* (John Russell Bartlett ed., 1862)................................................22

Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905)...........................................................................................................22

Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221 .............................................31

Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157 .......................31

Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73 ............................................31

Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232 .........................31

Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290 ...............31

Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34 ...........................................32

Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881) ....................31

Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110 .........................32

Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170 .............................31

Act of Dec. 1775, 15 *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* (Charles J. Hoadly ed., 1890) ...............................22

Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801* (1906) ................................................................26

Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14 ......................................31

Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112 .........................................31

Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21...............................31

Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* (1815)..........26

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17 ...............................................31

Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25 ....................................32

Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92...........................................31

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59 .............................................31

Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175 .................................. 31-32

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87...............................31

Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39 ...................................................31

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117........................................................31

Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112 .................................................31

Act of June 12, 1879, § 2, 1879 Ohio Laws 192 ................................................ 31-32

Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904)................................................................................26

Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144 ...............................31

Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890)..................................26

Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355 ..............................31

Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.............31

Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New York*, 95-96 (2d ed. 1807) ................................................................................................26

Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51 ...............................................31

Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80...................................................31

Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879).................................31

Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394 ................................31

Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421 .....................................31

Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86 ............................................31

Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.................................32

Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159 ................................31

Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468 .................................31

Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886)..........................................................22

Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556........................................31

Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (William Waller Hening ed., 1821) ............................................................... 22-23

Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656 ...........................................31

Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69 ...............................................31

Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297........................31

Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* (1869) ......................................................................................26

Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83 ........................31

Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30 .................... 31-32

Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67 ......................31

Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* (1794)......26

Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* (1777) ...............................................................................................22

*Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* (1767) .....................................................................21

*An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112-15 (1790).....................................................................................................21

Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873) ............................................................................................................31

Mass. Rev. Stat. ch. 134, § 16 (1836) ........................................................29

Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13 ...........................................23

Miss. Rev. Code ch. 77, § 2964 (1880) .................................................31

Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland, 1638-1674*
(E.B. O'Callaghan ed., 1868).................................................................26

Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*
(1902) ....................................................................................................22

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not request oral argument.

## STATEMENT OF THE ISSUE

Whether 18 U.S.C. § 922(g)(1)'s prohibition on the possession of firearms by felons violates the Second Amendment as applied to Taylor.

## STATEMENT OF THE CASE

In July 2020, Taylor and two others "were observed on video breaking into" a residence. [R. 53: Presentence Report at 237 (¶ 29).] "A cell phone and two cameras were taken from the residence." [*Id.*] Taylor carried a Glock 19 handgun during the burglary. [*Id.*] He was convicted in Carrol County District Court of complicity to commit second-degree burglary, receiving stolen property, and carrying a concealed deadly weapon. [*Id.*] The state court sentenced Taylor to imprisonment for seven and a half years on the burglary count, five years on the receiving stolen property count, and twelve months on the concealed weapon count, all suspended for five years of supervised probation. [*Id.*] Taylor's probation revocation hearing was scheduled for December 23, 2023, in the state court case. [*Id.*]

A short time after his felony convictions, Taylor knowingly possessed a Remington Model 770, a Sig Sauer P365XL handgun, and an American Tactical MilSport semi-automatic rifle that was capable of accepting large-capacity magazines. [*Id.* at 234-35 (¶¶ 7-10).] During the same time that he possessed the

1

firearms, "Taylor was a self-proclaimed 'Boogaloo Boy,'" and "made social media posts containing anti-government, anti-authority" information, as well as "posts that promoted violence towards law enforcement." [*Id.* at 235 (¶ 11).]

In November 2022, a grand jury in the Eastern District of Kentucky returned an indictment charging Taylor with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). [R. 1: Indictment at 1-3.] The grand jury subsequently returned a superseding indictment that added two additional counts of possession of a firearm by a felon. [R. 17: Superseding Indictment at 46-48.] Taylor ultimately entered a guilty plea to one count of possession of a firearm by a convicted felon, pursuant to a conditional plea agreement with the government. [R. 37: Plea Agreement at 148-54.] The district court sentenced Taylor to twenty-eight months of imprisonment, followed by three years of supervised release. [R. 50: Judgment at 216-18.] This appeal followed. [R. 51: Notice of Appeal at 223.]

## SUMMARY OF THE ARGUMENT

The district court correctly denied Taylor's motion to dismiss. As an initial matter, Taylor's Second Amendment challenge to § 922(g)(1) is foreclosed by this Court's precedent holding, based on the Supreme Court's reasoning in *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), that the federal felon-in-possession

statute does not violate the Second Amendment.  *See United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010).  The Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), did not alter the Court's earlier endorsement of felon-dispossession statutes in *Heller* or otherwise abrogate the rationale from this Court's decision in *Carey*.  As this Court and other district courts have recognized, *Carey* remains binding precedent.

Even considering § 922(g)(1)'s constitutionality anew, however, the statute remains constitutional.  As a textual and historical matter, felons are excluded from the protections of the Second Amendment for two reasons.  First, felons are not among "the people" protected by the Second Amendment.  Second, the Second Amendment, which is a pre-existing right, extends only to "law-abiding citizens," and thus, felons are not afforded the protections of the right itself.  *Heller*'s and *Bruen*'s authoritative interpretations of the Second Amendment right as extending to "law-abiding citizens" confirms this historical understanding.

Even assuming that felons are among the people protected by the Second Amendment, § 922(g)(1) is also consistent with our nation's historical tradition of firearm regulation.  Several historical precursors to § 922(g)(1)—including felony-punishment laws subjecting those who committed serious crimes to death or estate forfeiture; historical laws disarming other criminal offenders and loyalists; and laws disarming persons whose firearm possession posed a danger to society—

3

establish that Congress may lawfully disarm all felons, whose status as serious

criminal offenders supports Congress's legislative judgment that their firearm

possession is contrary to the public interest.

At a minimum, the district court properly determined that history supports

§ 922(g)(1)'s constitutional application as applied to Taylor, whose felony

conviction for burglary renders him a danger to public safety.  This Court should

affirm the district court's judgment.

## ARGUMENT[1]

The Second Amendment provides:  "A well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and bear

Arms, shall not be infringed."  U.S. Const. amend. II.  The Second Amendment

protects the right of "law-abiding, responsible citizens" to keep firearms in their

homes for self-defense.  *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

---

[1] This Court may hold this appeal in abeyance pending the Court's decision
in *United States v. Goins*, Case No. 23-5848.  *See* Motion filed by United States
with this Court on November 22, 2023, at 1-3.  The district court issued similar
rulings in this case and in *Goins*, and both cases present similar arguments on
appeal.  Thus, this Court may hold the instant appeal in abeyance pending the
resolution of the substantially similar issue in *Goins*.  *See, e.g.*, *Ware v. United
States*, 55 F. App'x 351, 351-52 (6th Cir. 2003) (noting that case held in abeyance
pending resolution of same argument by another panel).  Given the similarities in
the cases, the government has incorporated many of the same arguments that it
raised in the *Goins* case in the instant brief.

The Second Amendment also protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 8-10 (2022). "Like most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. There are, for example, certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626-27 & n.26; *see also United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010) ("In short, *Heller* states that the Second Amendment right is not unlimited, and, in fact, it is specifically limited in the case of felon prohibitions."); *United States v. Frazier*, 314 F. App'x 801, 807 (6th Cir. 2008) (relying on *Heller* to hold that defendants § 922(g)(1) "conviction is not in violation of the Second Amendment").

In the instant case, Taylor moved to dismiss the indictment and argued that § 922(g)(1) violated the Second Amendment as applied to him as an allegedly "nonviolent felony offender." [R. 24: Motion to Dismiss at 60.] The United States opposed Taylor's motion. [R. 28: Response at 97-116.]

The district court denied Taylor's motion to dismiss. [R. 32: Opinion and Order at 128.] Relying on its decision in a similar case, *United States v. Goins*, 647 F. Supp.3d 538 (E.D. Ky. 2022), the court determined "the Second Amendment does not prevent Congress from disarming those that it deems to be a danger to public safety." [R. 32: Opinion and Order at 130.] "And Congress

5

can base the decision to disarm a class of people upon modern judgments as to 'the categories of people whose possession of guns would endanger the public safety.'" [*Id.* at 131.]  The court found that "Taylor presents the exact sort of danger to the public on which a legislature can base a disbarment law." [*Id.* at 132.]  Indeed, "the historic understanding of burglary comports with the modern reason why Section 922(g)(1) burdens Mr. Taylor's rights." [*Id.* at 136.]  And "[b]oth founding era and modern legislatures recognize that the act of burglary creates the risk of retaliation or self-defense from the occupant." [*Id.*]  Thus, "Section 922(g)(1) does not violate Mr. Taylor's rights." [*Id.*]

This Court reviews the denial of a motion challenging the constitutionality of a statute de novo.  *United States v. Loney*, 331 F.3d 516, 524 (6th Cir. 2003).

A. *Taylor's Second Amendment challenge is foreclosed by this Court's precedent.*

Following the Supreme Court's decision in *Heller*, this Court has repeatedly relied on *Heller*'s assurances that "nothing in [that] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" to hold that § 922(g)(1) does not violate the Second Amendment.  *Frazier*, 314 F. App'x at 807 (quoting *Heller*, 554 U.S. at 626); *see also Carey*, 602 F.3d at 741 ("In short, *Heller* states that the Second Amendment right is not unlimited, and, in fact, it is specifically *limited* in the case of felon prohibitions."); *United States v. Whisnant*,

391 F. App'x 426, 430 (6th Cir. 2010) (discussing *Heller* and observing that "this Court has held that § 922(g)(1) comports with the Second Amendment"); *United States v. Khami*, 362 F. App'x 501, 507-08 (6th Cir. 2010) (relying on *Heller* to reject Second Amendment challenge to § 922(g)(1)); *United States v. Griffin*, 476 F. App'x 592, 598 (6th Cir. 2011) (same); *United States v. Goolsby*, No. 21-3087, 2022 WL 670137, at *2-3 (6th Cir. Mar. 7, 2022) (same).

This Court's decisions applying *Heller* to uphold § 922(g)(1) are consistent with the Supreme Court's recent decision in *Bruen* and therefore remain both persuasive and, in the case of *Carey*, binding precedent. *See United States v. Napier*, 233 F.3d 394, 397 (6th Cir. 2000) (treating precedent as binding "unless an inconsistent decision of the United States Supreme Court requires modification of the decision"). In *Bruen*, the Supreme Court struck down a New York law that required residents to demonstrate "proper cause" to obtain a license to carry a handgun outside the home because the law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." 597 U.S. at 71. The *Bruen* Court ultimately rejected the "two-step" framework adopted by most courts of appeals after *Heller* that "combine[d] history with means-end scrutiny." *Id.* at 17-19. Instead, the *Bruen* Court explained that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. And when

7

a regulation burdens such presumptively protected conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

*Bruen* did not suggest that prohibitions on the possession of firearms by felons are unconstitutional because *Bruen* did not address felon-in-possession laws or other status-based gun restrictions at all, a point emphasized in opinions joined by six justices. *See id.* at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm . . . .  Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 80-81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating *Heller*'s assurances that felons can be dispossessed of firearms); *id.* at 129 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on" *Heller*'s statements about felon-in-possession laws).  Rather, *Bruen* "reiterate[d]" *Heller*'s "standard," explained that its holding was "[i]n keeping with *Heller*," and said it was "apply[ing]" the "test that [the Court] set forth in *Heller*." *Id.* at 17-20, 24, 26.  In fact, *Bruen* implicitly endorsed pre-existing circuit precedents, like this

Court's, that were "broadly consistent with *Heller*." *Id.* at 19. This Court's post-*Heller* and pre-*Bruen* precedents thus remain sound.[2]

Taylor's efforts to disregard this Court's precedent by stating simply that *Bruen* "repudiated . . . the two-step analysis adopted by this Court" miss the mark. Taylor Brief at 6 (citing *United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012)). Although *Greeno* "adopt[ed]" and employed means-end scrutiny to find that an application of U.S.S.G. § 2D1.1(b)(1) did not violate the Second Amendment, *Greeno*, 679 F.3d at 518, this Court's pre-*Bruen* and pre-*Greeno* precedent upheld § 922(g)(1) based only on *Heller*'s repeated assurances that felon-disarmament laws were "longstanding" and lawful. *Frazier*, 314 F. App'x at 807; *Carey*, 602 F.3d at 741. Indeed, *Greeno* acknowledged that this Court's precedents upholding

---

[2] The district court in *Goins* held that *Bruen* "requires some reconsideration of the *Heller* admonition," and that this Court's pre-existing precedents applying *Heller*'s "dicta" were inapplicable to Goins's as-applied challenge. 647 F. Supp.3d at 543. That issue was not briefed in Taylor's case, likely because the district court had already issued its decision in *Goins*. This Court "may affirm the district court's decision to deny [a] motion to dismiss for any reason supported by the record and the arguments of the parties." *United States v. Noble*, 762 F.3d 509, 519 (6th Cir. 2014). Contrary to the district court's conclusion in *Goins*, *Heller* and pre-Bruen Sixth Circuit precedent remain binding on this issue. *See ACLU of Ky. v. McCreary Cnty., Ky.*, 607 F.3d 439, 447 (6th Cir. 2010) (concluding that "[l]ower courts are obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it"); *see also Khami*, 362 F. App'x at 508 (applying *Heller* to reject as-applied Second Amendment challenge to § 922(g)(1)).

9

§ 922(g)(1) "relied on" *Heller*'s statements regarding felon-disarmament laws, rather than on means-end scrutiny, "to reject Second Amendment challenges to federal felon-in-possession of a firearm convictions." *Greeno*, 679 F.3d at 517. *Bruen*'s rejection of means-end scrutiny therefore did not abrogate this Court's pre-existing precedent upholding § 922(g)(1).

Moreover, numerous district courts in this circuit have continued to treat this Court's pre-existing precedent as binding and dispositive in post-*Bruen* Second Amendment challenges to § 922(g)(1) charges. *See, e.g.*, *United States v. Omar*, No. 22-cr-182, 2023 WL 7526045, at *4 (S.D. Ohio Nov. 14, 2023) (concluding that "*Bruen* did not explicitly overrule *Heller*" and that the court was "bound by the assertions in *Heller* and *Carey* that the longstanding prohibitions on the possession of firearms by felons" are constitutional); *United States v. Ross*, No. 23-cr-20168, 2023 WL 7345908, at *11 (E.D. Mich. Nov. 7, 2023) (explaining that this Court's "pre-*Bruen* opinions remain binding" precedent); *United States v. Brown*, No. 22-cr-704, 2023 WL 7323335, at *3 (N.D. Ohio Nov. 7, 2023) (characterizing this Court's pre-*Bruen* precedent upholding § 922(g)(1) as "binding" and declining to "deviate" from it); *United States v. Deryke*, No. 23-cr-92, 2023 WL 7101902, at *4 (W.D. Mich. Oct. 27, 2023) (concluding that "*Bruen* did nothing to disturb the holdings in" pre-*Bruen* circuit decisions upholding § 922(g)(1), "and there is nothing to suggest that they would be decided differently

10

in [*Bruen*'s] wake"); *United States v. Blackwell-Esters*, No. 22-cr-20287, 2023 WL 7093806, at *4 (E.D. Mich. Oct. 26, 2023) (concluding that *Bruen* did not abrogate *Heller* and pre-existing Sixth Circuit precedent); *United States v. McNeil*, No. 23-cr-20229, 2023 WL 6627972, at *1 (E.D. Mich. Oct. 11, 2023) (treating this Court's "unambiguous[]" holding in *Carey* as binding); *United States v. Miller*, No. 22-cr-645, 2023 WL 6065116, at *3 (N.D. Ohio Sept. 18, 2023) (similar); *United States v. Nailor*, No. 23-cr-20076, 2023 WL 6049746, at *5 (E.D. Mich. Sept. 15, 2023) (similar); *United States v. Taylor*, No. 23-cr-289, 2023 WL 5957107, at *2 (N.D. Ohio Sept. 12, 2023) (similar); *United States v. Nelson*, — F. Supp. 3d —, 2023 WL 4249367, at *5 (E.D. Mich. June 29, 2023) (similar); *United States v. Parker*, No. 22-cr-82, 2023 WL 3690247, at *3 & n.3 (W.D. Ky. May 26, 2023) (similar); *United States v. Carter*, No. 22-cr-20477, 2023 WL 3319913, at *2 (E.D. Mich. May 9, 2023) (similar); *United States v. Smith*, No. 22-cr-20351, 2023 WL 2215779, at *1 n.3 (E.D. Mich. Feb. 24, 2023) (similar); *United States v. Gleaves*, — F. Supp. 3d —, 2023 WL 1791866, at *3-4 (M.D. Tenn. Feb. 6, 2023) (similar). Taylor's position is also inconsistent with this Court's own recent recognition in an unpublished order that *Carey* "unambiguously held . . . that felon-in-possession statutes do not violate the Second Amendment," "remains the binding law in this circuit." *United States v. Vaughn*, No. 23-5790, 2023 U.S. App. LEXIS 25818, at *3 (6th Cir. Sept. 28,

11

2023).[3]  Because "*Carey* remains the precedent in this circuit," *id.*, Taylor's

Second Amendment challenge to § 922(g)(1) is foreclosed.  This Court should

affirm on that basis.  Indeed, "any other reconciling" of the caselaw "should come

. . . from the Supreme Court."  *Timmreck v. United States*, 577 F.2d 372, 377 (6th

Cir. 1978) (*revs'd on other grounds by United States v. Timmreck*, 441 U.S. 780,

783 (1979)).

> B.    *Felons are not among "the people" covered by the Second Amendment.*

Even if *Bruen* abrogated this Court's pre-existing precedent upholding

§ 922(g)(1) under the Second Amendment, Taylor's Second Amendment claim

fails under the post-*Bruen* framework.  The text of the Second Amendment does

not cover Taylor or other felons because felons are not among "the people"

protected by the Second Amendment.  "[T]he Second Amendment, like the First

and Fourth Amendments, codified a *pre-existing* right," neither "granted by the

Constitution" nor "dependent upon that instrument for its existence."  *Heller*, 554

---

[3] Since *Bruen*, another court of appeals has held, on plenary review, that its pre-existing precedent upholding § 922(g)(1) under the Second Amendment survived *Bruen*.  *See Vincent v. Garland*, 80 F.4th 1197, 1201-02 (10th Cir. 2023) (holding that although "*Bruen* created a new test for determining the scope of the Second Amendment," it did not "indisputably and pellucidly abrogate [the court's prior] precedential opinion" upholding § 922(g)(1)).

U.S. at 592; *see also id.* at 599 (explaining that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors'" (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)).  The right to bear arms is thus "enshrined with the scope [it was] understood to have when the people adopted [it]." *Id.* at 634-35.

Although, as Taylor highlights, Taylor Brief at 10, the text of the Second Amendment does not expressly except felons from "the people" covered by the Second Amendment, "'[t]he people'" is "a term of art employed in select parts of the Constitution" to refer to "a class of persons who are part of a national community." *Heller*, 554 U.S. at 580 (cleaned up).  The Second Amendment thus guarantees the right to bear arms only to "*members of the political community*," not to all persons. *Id.* (emphasis added).

The Second Amendment's background illuminates the reasons for that limitation.  The Founders codified the right to bear arms in large part because they regarded it as an important "safeguard against tyranny." *Heller*, 554 U.S. at 600.  Justice Story, for instance, described the right to bear arms as the "palladium of the liberties of a republic" and explained that it "enable[s] the people to resist and triumph over" the "usurpation and arbitrary power of rulers."  3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890, at 746 (1833).  It

makes sense that a right that was codified to enable the polity to "resist tyranny," *Heller*, 554 U.S. at 598, would be limited to the members of that polity.

Consistent with that understanding, persons who do not belong to the political community have historically been denied the right to bear arms. For example, the right to bear arms has historically been reserved to "citizens." *Heller*, 554 U.S. at 635; *see id.* at 581 ("Americans"). Noncitizens at the Founding lacked the "right to bear arms"—just as they lacked other "rights of members of the polity," such as the right to "vote, hold public office, or serve on juries." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998). Even today, federal law disarms certain noncitizens— specifically, those who are unlawfully present in the United States, those who are present on nonimmigrant visas, and those who have renounced U.S. citizenship. *See* 18 U.S.C. § 922(g)(5) and (7). Like noncitizens, felons disarmed under § 922(g)(1) are not among "the people" protected by the Second Amendment because they have forfeited their membership in the political community. *Cf. Voisine v. United States*, 579 U.S. 688, 715 (2016) (Thomas, J., dissenting) (tying *Heller*'s approval of felon disarmament to understanding that certain individuals "are beyond the scope of the 'People' protected by the Second Amendment"). States have long denied felons the rights of members of the polity—the right to vote, *see* U.S. Const. Amend. XIV, § 2; *Richardson v. Ramirez*, 418 U.S. 24, 41-56 (1974); the right to hold

public office, *see Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998); and the right to serve

on juries, *see id.* And as a leading 19th century scholar explained, "the felon" has

"been almost universally excluded" from "the people in whom is vested the

sovereignty of the State." Thomas M. Cooley, *A Treatise on the Constitutional*

*Limitations Which Rest Upon the Legislative Power of the States of the American*

*Union* 28-29 (1868).

Contrary to Taylor's contention, Taylor Brief at 12-13, the term "the people"

need not bear precisely the same meaning in the Second Amendment that it does in

other constitutional provisions that use the term. While the phrase "the people"

refers to members of the political community throughout the Constitution, *see*

*Heller*, 554 U.S. at 580, the scope of that community varies from provision to

provision. As explained *supra*, noncitizens are not among "the people" protected

by the Second Amendment, *see id*. at 581, but certain noncitizens are among "the

people" protected by the Fourth Amendment, *see United States v. Verdugo-*

*Urquidez*, 494 U.S. 259, 265, 271-73 (1990). The same is true of felons. And

many other constitutional provisions use the term "the people" in a manner that

excludes felons who have forfeited the rights that come with membership in the

polity. Such felons are not among "the people" who adopted the Constitution, *see*

U.S. Const. Pmbl; or "the [p]eople" who are entitled to elect members of Congress,

*see* U.S. Const. art. I, § 2, cl. 1; U.S. Const. amend. XVII, Cls. 1-2; or "the people"

who reserved powers not delegated to the government, *see* U.S. Const. amend. X. So too, felons disarmed under § 922(g)(1) are not among "the people" entitled to keep and bear arms.

This Court's decision in *Tyler* also does not establish that Taylor is among "the people." Taylor Brief at 11. *Tyler* applied means-end scrutiny to hold that the plaintiff in that case had a viable as-applied challenge to 18 U.S.C. § 922(g)(4), which prohibits an individual who has been "adjudicated as a mental defective or . . . committed to a mental institution" from possessing firearms. *Tyler v. Hillsdale Cty. Sherriff's Dept.*, 837 F.3d 678, 699 (6th Cir. 2016). But *Tyler*, which pre-dates *Bruen*, did not grapple with the scope of the term "the people" under the Second Amendment at all, let alone suggest that felons are among "the people" protected by the Second Amendment. Rather, *Tyler* endorsed and distinguished this Court's prior decisions upholding § 922(g)(1) under *Heller* by recognizing that "[a] felony conviction, unlike an adjudication of incompetence or involuntary commitment, 'trigger[s] a number of disabilities, many of which impact fundamental constitutional rights.'" *Tyler*, 837 F.3d at 688 n.9. *Tyler* thus confirmed that felons may be stripped of rights tethered to membership in the political community by virtue of their felon status.

16

C.    *The right to bear arms extends only to law-abiding citizens.*

Separate from the Second Amendment's textual limitation of the right to bear arms to "the people," *the right* to bear arms itself has historically been understood to extend only to *law-abiding citizens*. "The reason is that the Second Amendment's text . . . codified what the *Heller* Court called a 'pre-existing right'" that "extended (and thus extends) to some categories of individuals, but not others." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044 (11th Cir. 2022). Thus, "even individuals who are indisputably part of 'the people' . . . might not partake of that pre-existing right and, therefore, may be prohibited from possessing firearms without offending the Second Amendment." *Id*. at 1045-46.

The Supreme Court's authoritative interpretation of the Second Amendment's text confirms that view. *Heller* explained that the Amendment codified a "right of law-abiding, responsible citizens." 554 U.S. at 635. The Supreme Court identified a non-exhaustive list of "presumptively lawful regulatory measures," including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626-27 & n.26; *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (opinion of Alito, J.). *Bruen* confirmed this reading of *Heller*. Echoing *Heller*, the Court explicitly and repeatedly described the Second Amendment right as belonging only to law-abiding citizens. *See, e.g.*, *Bruen*, 597 U.S. at 8 (stating that *Heller* "recognized that the Second and

17

Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"); *id.* at 26 (quoting *Heller*'s statement that the Second Amendment protects "'the right of law-abiding, responsible citizens to use arms' for self-defense"); *id.* at 29 (stating that the historical inquiry should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id.* at 71 (holding that New York's licensing law violates the Second Amendment because "it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms"); *see also United States v. Alaniz*, 69 F.4th 1124, 1127 (9th Cir. 2023) (reading *Heller* as "conclud[ing] that [the Second Amendment] protects the 'law-abiding, responsible' citizen's possession of arms for the 'lawful purpose of self-defense'").  These repeated references indicate that laws restricting the gun rights of non-law-abiding citizens, like convicted felons, are consistent with the Second Amendment.

Moreover, *Bruen* explained that the petitioners in that case were law-abiding when addressing the Second Amendment's *textual scope*, not when addressing historical precursors supporting the challenged law.  *See* 597 U.S. at 31-32.  The Court observed that the parties did not dispute "that petitioners" are "two ordinary, law-abiding, adult citizens" and "are part of 'the people' whom the Second Amendment protects."  *Id*. (citing *Heller*, 554 U.S. at 580).  The Court thus

18

implied that the Second Amendment covered the petitioners *because* they were undisputedly law-abiding, responsible citizens.

*Bruen* further noted that its opinion should not "be interpreted to suggest the unconstitutionality" of shall-issue licensing regimes of many other states that "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." 597 U.S. at 39 n.9 (citing *Heller*, 554 U.S. at 635); *see also id.* at 80 (Kavanaugh, J. concurring) ("[T]he 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so."). Those licensing regimes require background checks and set "narrow, objective, and definite standards" meant to ensure "that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 39 n.9. Many (if not all) states' standards disqualify felons or anyone prohibited by federal law from obtaining a license. By indicating that those regimes remain broadly constitutional, the Court strongly implied that the Second Amendment's text excludes people, like felons, who are not law-abiding.

Taylor's contention that the term "law-abiding, responsible citizens" is too "vague," Taylor Brief 14, ignores the Supreme Court's heavy deployment of the phrase and the history and tradition giving it context. In any event, this Court need not define the outer bounds of who is among "law-abiding, responsible citizens" to affirm the district court's ruling here.

19

D.    *Section 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation.*

Even assuming the Second Amendment's text covers felons, our nation's historical tradition supports disarming them.  *See Bruen*, 597 U.S. at 17.  Indeed, history is replete with "representative historical analogue[s]" that justify § 922(g)(1) under the Second Amendment.  *Id*. at 30 (emphasis omitted).

Felonies have long been considered "the most serious category of crime." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019).  In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt."  4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769).  Blackstone observed that "[t]he idea of felony is so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98 (capitalization omitted); *see also Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (explaining that, at common law, "virtually all felonies were punishable by death").

Capital punishment and estate forfeiture were also commonly authorized punishments in the American colonies and then the states.  Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'"  *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J.,

20

concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)).  Indeed, the First Congress, which drafted and proposed the Second Amendment, made a variety of felonies punishable by death, including treason, murder on federal land, piracy on the high seas, and forging or counterfeiting a public security.  *See An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112-15 (1790).  And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate.  *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).  These punishments often applied not only to violent crimes but also to crimes such as counterfeiting and forgery.[4]

---

[4] *See, e.g.*, 2 *Laws of the State of New York Passed at the Sessions of the Legislature* (1785-1788) at 664-66 (1886) (1788 law establishing death penalty and estate forfeiture for crimes such as robbery and counterfeiting); 9 William Waller Hening*, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302-03 (1821) (1777 law punishing forgery with estate forfeiture, whipping, and up to seven years' service on an armed vessel); *Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* 33-34 (1767) (1743 law punishing forging or counterfeiting bills of credit with death and estate forfeiture); 1 *The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* 79 (1811) (1715 law punishing with estate forfeiture anyone convicted of corruptly "altering any will or record" in a way that resulted in injury to another's estate or inheritance).

Historically, even the commission of non-death penalty offenses could still result in the loss of the right to possess arms. In 1624, for example, Virginia punished a person for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the colony. David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). In 1775, Connecticut enacted a statute providing that a person who was convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms." Act of Dec. 1775, 15 *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890). And during the American Revolution, the Continental Congress recommended, and most States enacted, laws disarming loyalists and others who refused to swear allegiance to the new Republic.[5] These disarmament

_____

[5] *See* 4 *Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the*

22

measures reflect broad legislative authority to decide when breaking the law

warranted excluding even nonviolent offenders from the right to keep and bear

arms.

Historical laws also demonstrate "that legislatures have the power to prohibit

dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th

Cir. 2019) (Barrett, J., dissenting); Joseph G.S. Greenlee, *The Historical

Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo.

L. Rev. 249, 272 (2020) (observing that in "each [relevant] historical period,"

"violent or otherwise dangerous persons could be disarmed").  "[B]y the time of

American independence, England had established a well-practiced tradition of

disarming dangerous persons—violent persons and disaffected persons perceived

as threatening to the crown."  Greenlee, 20 Wyo. L. Rev. at 261; *see id.* at 259-61

(detailing history).  In England, the 1662 Militia Act empowered the government

to "seize all arms in the custody or possession of any person" who was "judge[d]

dangerous to the Peace of the Kingdom."  Militia Act 1662, 13 & 14 Car. 2, c. 3,

§ 13.  Parliament subsequently recognized a legal right to possess arms in the Bill

of Rights.  1 W. & M. Sess. II, c. 2 (1688) (Eng.).  The Bill recited that King James

---

*First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening

ed., 1821).

II, who had been deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants." *Id.* To prevent the repetition of that abuse, the Bill guaranteed that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." *Id.*

The English Bill of Rights condemned the disarming of "good subjects but allowed the disarming of irresponsible or dangerous ones. It did not displace the 1662 Militia Act, the use of which "continued unabated" after the adoption of the English Bill of Rights. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405 (2019).[6] Indeed, many 18th-century justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[7]

_____

[6] *See, e.g.*, *Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700–8 March, 1702*, at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to disarm "dangerous" persons); Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV* 343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk 148* (1905) (similar).

[7] Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); *see, e.g.*, Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a*

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor."  2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 597 U.S. at 40-41.  Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, and violations were punishable by forfeiture of the weapons.[8]  Even at the time of the American Revolution, the English Bill of Rights was understood to allow disarming irresponsible and non-peaceable subjects.  In 1780, after London officials responded to widespread rioting by confiscating rioters' arms, the House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights.  Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-132 (1994).

The American colonies inherited that English tradition.  *See Heller*, 554 U.S. at 593 (noting the English right "has long been understood to be the predecessor to our Second Amendment").  Early American justice-of-the-peace manuals

_____

*Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

[8] *See, e.g.*, 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787); 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

explained that the Statute of Northampton, which the colonies inherited along with

other pre-colonization statutes, *see Patterson v. Winn*, 30 U.S. (5 Pet.) 233, 241

(1831), empowered justices of the peace to confiscate the arms of persons who

carried them in a manner that spread fear or terror.[9]  Some 17th- and 18th-century

American statutes expressly recodified that rule.[10]  Others made forfeiture part of

the penalty for offenses such as unsafe storage of guns or gunpowder.[11]  Although

those laws concerned forfeiture of arms involved in an offense, rather than bans on

possessing arms, they show that legislatures could restrict an individual's ability to

------

[9] *See, e.g.*, James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[10] *See, e.g.*, Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[11] *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland, 1638-1674*, at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New York*, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-210 (1906).

bear arms if his conduct suggested that his possession of firearms would endanger others.

Precursors to the Second Amendment proposed at the state ratifying conventions also indicate that legislatures have long been permitted to disarm lawbreakers and those who are dangerous. A proposed bill of rights presented at the Pennsylvania ratifying convention stated that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971). The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, *id.* at 624, which was widely read and proved "highly influential" on the Bill of Rights. *Heller*, 554 U.S. at 604.

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added). The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001).

27

Taylor's suggestion that these Founding-era precursors are irrelevant because they did not become law misses the mark. Taylor Brief 19-21. These Second Amendment precursors shed light on the meaning of a "pre-existing," "venerable," and "widely understood right" right to bear arms. *See Heller*, 554 U.S. at 603-05 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal"). And the common conception that runs through these precursors is that the government may disarm those who are not law-abiding, responsible citizens.

Post-ratification commentators and legislative enactments confirm this understanding of the Second Amendment. For example, John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, if he demeans himself peaceably, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law 186* (1840) (emphasis added). A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1. And Joseph Gales, a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, *Prevention of Crime*, *in* O.H. Smith, *Early Indiana Trials and Sketches* 466-467 (1858).

28

In the 1840s, states began to adopt surety statutes that required certain potentially irresponsible individuals who carried firearms to post bond.  *See Bruen*, 597 U.S. at 55.  The earliest such statute, enacted by Massachusetts, required a gun owner to post bond if his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self- defense.  Mass. Rev. Stat. ch. 134, § 16 (1836).  At least nine other jurisdictions adopted variants of that law later in the 19th century. *See Bruen*, 597 U.S. at 56 & n.23 (collecting statutes).  These firearm-specific surety laws were not a 19th-century innovation but built upon a surety tradition that existed at common law, *see* 4 William Blackstone, *Commentaries on the Laws of England* 252 (1769), that was codified by some colonies in the 1700s,[12] and was commonplace in the period immediately after the founding.[13]

---

[12] *See Act About Binding to the Peace*, ch, 26, 1700 Pa. Laws 5; *Act About Binding to the Peace*, ch. 4, 1700 Del. Laws 52; 1702 Conn. Acts 91; *Act Declaring the Mode of Proceeding in Certain Criminal Cases*, ch. 30, § 16, 1789 Va. Laws 17-18.

[13] *See State v. Davis*, 5 S.C.L. (3 Brev.) 3, 4 (S.C. Const. Ct. App. 1811); *Respublica v. Donagan*, 2 Yeates 437 (Pa. 1799); Tapping Reeve, *The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of Chancery* 65-66 (New Haven, Oliver Steele 1816).

As the 19th century wore on, guns became more lethal and more widely available.  Guns in the 18th century generally fired only one shot, misfired, took a long time to load, and could not be kept loaded for long periods.  Randolph Roth, *Why Guns Are and Are Not the Problem*, *in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019).  But technological developments in the 1800's—such as metallic cartridges; cheap, mass-produced revolvers; and guns capable of firing multiple shots—led to increased firearm use in homicides.  *Id.* at 123-127.  During this time, legislatures disarmed a range of individuals whom they deemed

categorically unfit to carry firearms, including those below certain ages,[14] those of

unsound mind,[15] vagrants,[16] and intoxicated persons.[17]

---

[14] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[15] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[16] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12,

State courts upheld such laws on the ground that the disqualified individuals were apt to use arms irresponsibly. The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to keep and bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (Ohio 1900).

These historical sources are suitable precursors to § 922(g)(1) because they are comparable in "how and why" they "burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. Section 922(g)(1) and the similar historical laws impose a "comparable burden" because each prevents a person from possessing arms. Capital punishment and estate forfeiture laws did so indirectly,

---

1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[17] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879).

by either depriving felons of their lives or requiring them to forfeit all their possessions. Other laws, such as laws disarming loyalists or those deemed irresponsible and dangerous, targeted firearms directly. But all had the effect of disarming classes of individuals that the legislature determined should not possess or carry firearms.

Section 922(g)(1) and these historical laws are also "comparably justified." *Bruen*, 597 U.S. at 29. Legislatures historically burdened firearm possession on the basis that certain people's lawbreaking, irresponsibility, lack of loyalty, or other traits rendered them too untrustworthy to possess firearms. Similarly, § 922(g)(1) targets those who have been "convicted of serious crimes" because, as a class, they can "be expected to misuse" firearms. *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983); *see, e.g.*, *Lewis v. United States*, 445 U.S. 55, 67 (1980) ("The federal gun laws . . . [focus on the] fact of conviction . . . in order to keep firearms away from potentially dangerous persons."); *Barrett v. United States*, 423 U.S. 212, 220 (1976) ("The history of [§ 922(g)] reflects a similar concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons.").

Contrary to Taylor's suggestions, *Bruen* does not mandate a "stringent standard" requiring proof of a "distinctly similar" historical analogues. Taylor Brief at 15-21. Rather, *Bruen* identified guideposts for "assess[ing] whether

33

modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. These guideposts are all part of a single test for deciding if a modern regulation is "analogous enough" to "historical precursors" to "pass constitutional muster." *Id*. at 30. The Supreme Court explained that "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id*. at 28-29. It further clarified that this historical inquiry is not "a regulatory straightjacket" and "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*. at 30.

Indeed, *Bruen* used "distinctly similar"—the key phrase Taylor relies on—just once. *Id.* at 26. And when it did, it described "the lack of a distinctly similar historical regulation" only as "relevant evidence," not as dispositive of the historical inquiry. *Id.* In conducting its historical survey of public carry laws, the Supreme Court never referenced the purported "distinctly similar" standard, even though the question of publicly carrying firearms would surely qualify as a general societal problem that has persisted for centuries. On the other hand, the Court repeatedly asked whether early regulations were "relevantly similar" to New York's modern-day law. *See, e.g.*, *id.* at 29. The district court thus did not err by

34

concluding that the government needed only to identify "relevantly similar" analogues to satisfy its burden under *Bruen*.

For the same reasons, it is of no import that there are no Founding-era statutes specifically disarming felons, and the district court did not err by failing to identify a historical twin of § 922(g)(1). Taylor Brief 25-26. The government's historical precursors are sufficiently similar to § 922(g)(1) because they imposed severe consequences on the commission of a felony and authorized legislatures to disarm untrustworthy people. *See id*. at 27-30. They are thus "analogous enough to pass constitutional muster." *Id*. at 30. Moreover, the lack of an identical historical statute does not suggest that the Founding generation would have regarded § 922(g)(1) as incompatible with the Second Amendment. As one district court recently observed, a "list of the laws that happened to exist in the founding era is . . . not the same thing as an exhaustive account of what laws would have been theoretically believed to be permissible by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, No. 22-CR-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022) (emphasis omitted). Founding-era legislatures cannot be presumed to have legislated to the full limits of their constitutional authority, and the absence of a "dead ringer" cannot be held against the government. *Bruen*, 597 U.S. at 30.

35

E.     *Section 922(g)(1) is constitutional as applied to Taylor.*

In any event, as the district court properly found, § 922(g)(1) is

constitutional as applied to Taylor because "[h]aving committed a burglary, . . .

Taylor presents the exact sort of danger to the public on which a legislature can

base a disarmament law." [R. 32: Opinion and Order at 132.] That is, at

a minimum, there is "a historic tradition of disarming groups that the legislature

views as threatening the public safety," and a convicted burglar like Taylor clearly

would pose a risk to public safety if he possessed a gun. *Goins*, 647 F. Supp. 3d at

552. Indeed, burglary is unquestionably a dangerous crime and presents a risk of

violence and death. *See James v. United States*, 550 U.S. 192, 203-04 (2007)

(detailing risks presented by burglary and attempted burglary, including potential

for "violent confrontation[s]"), *overruled by Johnson v. United States*, 576 U.S.

591 (2015).

Taylor's conduct underlying his burglary conviction only underscores this

point. Taylor, while carrying a handgun, broke into a residence and removed items

from the residence. [R. 53: Presentence Report at 237 (¶ 29).] That conduct

clearly presented a risk of a violent confrontation and shows that Taylor poses

a risk to public safety by possessing firearms.

The district court also correctly rejected Taylor's argument, Taylor Brief at

21-25, that "*Bruen* compels the Court to undertake a purely historical analysis"

36

when considering his as-applied challenge.  [R. 32:  Opinion and Order at 134.]

As the district court reasoned, "*Bruen* does not shackle Congress to eighteen

century sensibilities," and thus, what was required to establish burglary at common

law is not determinative here.  [*Id.*]  *See Bruen*, 597 U.S. at 30 (clarifying that "the

Second Amendment is neither a regulatory straightjacket nor a regulatory blank

check" and that the Second Amendment does not require a "dead ringer" historical

analogue).  Even under such a strict historical view, burglary is and has always

been a serious offense.  "[E]arly statutes characterized burglary as a felony

punishable by death, branding, or mutilation."  *United States v. Coombes*, 629 F.

Supp.3d 1149, 1163 (N.D. Ok. 2022) (collecting historical statutes).  "[M]odern

authorities continue to recognize the violent nature of burglary, as 18 U.S.C.

§ 924(e) included burglary in its definition of 'violent felony.'"  *Id.*  As the district

court explained, "the historic understanding of burglary comports with the modern

reason why Section 922(g)(1) burdens . . . Taylor's rights.  Both founding era and

modern legislatures recognize that the act of burglary creates the risk of retaliation

or self-defense from the occupant.  Congress's motive for disarming . . . Taylor is

not just relevantly similar to the historic concern with burglars; in fact, the two are

identical."  [R. 32:  Opinion and Order at 136.]

Finally, Taylor's heavy reliance on the Third Circuit's decision in *Range v.*

*Attny Gen.*, 69 F.4th 96 (3d Cir. 2023), does not support his position.  As an initial

37

matter, the Third Circuit was careful to note that its decision was "a narrow one." *Id.* at 106. Range's disqualifying offense was a decades-old state-law misdemeanor conviction for food-stamp fraud. *Id.* at 98. The Third Circuit would not necessarily reach the same result here, where the underlying felony conviction was burglary. Indeed, the Third Circuit noted that earlier felony firearm bans covered "violent crimes," like "burglary," and those crimes were much different than Range's conviction for food stamp fraud. *Id.* at 104.

## CONCLUSION

This Court should affirm Taylor's conviction.

Respectfully submitted,

CARLTON S. SHIER, IV
UNITED STATES ATTORNEY

CHARLES P. WISDOM JR.
CHIEF, APPELLATE DIVISION

By:    s/ Amanda Harris Huang
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4874
Amanda.HarrisHuang@usdoj.gov

38

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7)(B).  According to a computer count, the principal

brief contains 9,352 words.

s/ Amanda Harris Huang
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

On January 19, 2024, I electronically filed this brief through the ECF

system, which will send the notice of docket activity to:

Robert L. Abell
*Attorney for Trenton Layne Taylor*

s/ Amanda Harris Huang
Assistant United States Attorney

**APPELLEE'S DESIGNATION OF DISTRICT COURT DOCUMENTS**

| Record Entry | Description of Document | Page ID# |
|:---:|:---|:---|
| 1 | Indictment | 1-3 |
| 17 | Superseding Indictment | 46-49 |
| 24 | Motion to Dismiss | 60-88 |
| 28 | Response | 97-117 |
| 32 | Opinion and Order | 128-37 |
| 37 | Plea Agreement | 148-54 |
| 50 | Judgment | 216-22 |
| 51 | Notice of Appeal | 223 |
| 53 | Presentence Report | 232-45 |