# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

## No. 23-5644

---

### UNITED STATES OF AMERICA,

#### Plaintiff-Appellee

### v.

### TRENTON LAYNE TAYLOR,

#### Defendant-Appellant

---

**Appeal from the United States District Court
For the Eastern District of Kentucky at Frankfort
Criminal Action No. 3:22-cr-22-S
Hon. Gregory F. Van Tatenhove**

---

## REPLY BRIEF FOR APPELLANT

---

**ROBERT L. ABELL
120 North Upper St.
Lexington, KY 40507
859-254-7076
859-281-6541 Fax
Robert@RobertAbellLaw.com
COUNSEL FOR APPELLANT**

# Table of Contents

Page #

Table of Contents..............................................................................ii

Table of Authorities.........................................................................iii

Introduction and Summary of Reply Argument............................................1

Argument....................................................................................2

1.  Taylor's Second Amendment challenge to 18 U.S.C. § 922(g)(1) is
    not barred by binding precedent...........................................................2

(A) The government has waived the argument that binding precedent
    forecloses Taylor's Second Amendment challenge
    to 18 U.S.C. § 922(g)(1)...................................................................3

(B) *Carey* did not establish binding precedent...........................................4

(C) *Carey*'s vitality as binding precedent has been undermined in any
    event..........................................................................................7

2.  The Second Amendment protects an individual right distinguishable
    from "political" rights such as voting, jury service and holding
    public office, which require an individual to act as part of a
    collective...............................................................................10

3.  The Court should not attribute an inconsistent meaning to
    "the people" as used in the Constitution...............................................14

4.  The Supreme Court did not rewrite the Second Amendment to
    protect only "law-abiding" individuals.................................................17

5.  *Bruen* requires the government to show a "distinctly similar"
    historical analogue to the application to Taylor of 18 U.S.C.
    § 922(g)(1)..............................................................................19

6.  History does not support the proposition that felons lose their
    Second Amendment rights because of their status as felons.............22

7.    The Government's contention that the Second Amendment grants Congress "broad legislative authority" to decide to disarm those deemed "dangerous" is contrary to *Bruen* and without merit............26

Conclusion.................................................................................30

Certificate of Service.....................................................................31

Rule 32(a)(7)(B) Certificate of Compliance......................................31

## Table of Authorities

**Cases**                                                                 **Page #**

*Avery v. Everett*, 18 N.E. 148 (N.Y. 1888).......................................24

*Binderup v. Attorney General,* 836 F.3d 336, 344 (3ʳᵈ Cir. 2016) (*en banc*), *cert. denied*, 582 U.S. 943 (2017).......................................18

*Bowles v. Habermann*, 95 N.Y. 246 (1884)......................................25

*Carducci v. Regan,* 714 F.2d 171 (D.C. Cir. 1983)...............................6

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264(1821)..............................6

*Davies Warehouse Co. v. Bowles,* 321 U.S. 144 (1944)........................5

*District of Columbia v. Heller*, 554 U.S. 570 (2008)........................*passim*

*Freed v. Thomas,* 81 F.4ᵗʰ 655 (6ᵗʰ Cir. 2023)..................................5

*In re Estate of Nerac*, 35 Cal. 392 (1868)........................................24

*Kanter v. Barr,* 919 F.3d 437 (7ᵗʰ Cir. 2019)..........................11-18, 22-25

*Lange v. California*, 141 S.Ct. 2011 (2021)........................................18

*Massachusetts v. United States*, 333 U.S. 611 (1948)...........................6

*McDonald v. City of Chicago*, 561 U.S. 242 (2010)......................................17

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019)....................................12

*New York St. Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022).......*passim*

*Range v. Attorney General*, 69 F.4th 96 (3rd Cir. 2023)(*en banc*).........14-19, 23,25-27

*Ruffin v. Commonwealth*, 62 Va. 790 (1871)................................................24

*Tyler v. Hillsdale Co. Sheriff's Dept.*, 837 F.3d 678 (6th Cir. 2016) (*en banc*)...................................................................................1, 5, 8-10

*United States v. Carey*, 602 F.3d 738 (6th Cir. 2010)...........................1, 4-10

*United States v. Catalan,* 499 F.3d 604 (6th Cir. 2007)................................4

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023)..............7, 19, 21, 27-29

*United States v. Goins*, 647 F.Supp.3d 538 (E.D. Ky. 2022)...............3, 7, 15

*United States v. Noble,* 762 F.3d 509 (6th Cir. 2014)....................................3

*United States v. Russell,* 26 F.4th 371 (6th Cir.), *rehearing en banc denied,* 31 F.4th 1009, *cert. denied,* 143 S.Ct. 385 (2022)..................................3

*United States v. White,* 920 F.3d 1109 (6th Cir. 2019), cert. denied, 140 S.Ct. 2667 (2020)..........................................................................8

*United States v. Williams,* 616 F.3d 685 (7th Cir. 2010)...............................9

*Wright v. Spaulding*, 939 F.3d 695 (6th Cir. 2019)...............................4-6, 10

**Constitutional Provisions & Statutes**

U.S. Const. amend. II............................................................*passim*

18 U.S.C. § 922(g)(1)............................................................*passim*

18 U.S.C. § 922(g)(4)....................................................................8

**Other Authorities**

John D. Bessler, *Cruel & Unusual* (2012).......................................................23

Thomas M. Cooley, *A Treatise on the Constitutional Limitations*
    (1st ed. 1868)............................................................................................11

Saul Cornell, *"Don't Know Much About History" The Current Crisis*
    *in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657 (2002)....11

Saul Cornell, *A New Paradigm for the Second Amendment*, 22 Law
    & Hist. Rev. 161 (2004).........................................................................12

Lawrence M. Friedman, *Crime and Punishment in American History*
    (1993)........................................................................................................23

Robert H. Churchill, *Gun Regulation, the Police Power, and the*
    *Right to Keep Arms in Early America: The Legal Context*
    *of the Second Amendment*, 25 L. & Hist. Rev. 139 (2007)................30

**Introduction and Summary of Reply Argument**

This reply brief offers the following argument points:

(1) Taylor's challenge to his prosecution under 18 U.S.C. § 922(g)(1) is not foreclosed by binding precedent. First, the government has waived this argument. Second, this Court's decision in *United States v. Carey*, 602 F.3d 738 (6th Cir. 2010), was not and is not binding precedent.  Third, even if *Carey* were once a binding precedent, its vitality as such has been undermined and superseded by the Supreme Court's decision in *New York St. Rifle & Pistol Ass'n,* 142 S.Ct. 2111 (2022), and this Court's en banc decision in *Tyler v. Hillsdale Co. Sheriff's Dept.*, 837 F.3d 678 (6th Cir. 2016).

(2) The Second Amendment right to keep and bear arms is an individual right distinguishable from "political" or civic rights such as voting, jury service and holding public office, which require an individual to act as part of a collective. While there is a historical tradition of stripping felons of political or civic rights exercised as part of a collective, there is no historical tradition of stripping felons of the individual Second Amendment right.

(3) The Court should not attribute inconsistent meanings to the term "the people" as used in the Constitution as the government suggests. The

Supreme Court has indicated that this would be inappropriate. Moreover, doing so would intrude improperly on legislative prerogatives to fashion public policy.

(4) The Supreme Court has not held that the Second Amendment applies only to "law-abiding" individuals. The Court should not accept the government's invitation to over-read dicta from Supreme Court opinions and re-write the Second Amendment.

(5) The Supreme Court established in *Bruen*, *supra*, "two conceptual pathways" to evaluate the constitutionality of firearm regulations. Where, as here, the law is aimed at the age-old problem of crime, the government has to identify a "distinctly similar" historical analogue to the application of 18 U.S.C. § 922(g)(1) to Taylor. It has not done so.

(6) Contrary to the government's contentions, history does not support the proposition that felons lose their Second Amendment rights because of their status as felons.

(7) The government's contention that the Second Amendment grants Congress "broad legislative authority" to decide to disarm those deemed "dangerous" is contrary to *Bruen* and without merit.

### Argument

**1.    Taylor's Second Amendment challenge to 18 U.S.C. § 922(g)(1) is not barred by binding precedent**

**(A)    The government has waived the argument that binding precedent forecloses Taylor's Second Amendment challenge to 18 U.S.C. § 922(g)(1)**

The government forfeited in the district court its argument that binding precedent forecloses Taylor's Second Amendment as-applied challenge to 18 U.S.C. § 922(g)(1) by failing to raise it. A party forfeits an argument when it fails to timely raise it. *United States v. Russell*, 26 F.4th 371, 375 (6th Cir.), *rehearing en banc denied*, 31 F.4th 1009, *cert. denied*, 143 S.Ct. 385 (2022).

The government acknowledges the forfeiture and implies that it did so because the district court had previously rejected the argument in *United States v. Goins*, 647 F.Supp.3d 538 (E.D. Ky. 2022). Govt. brief at 9 n. 2. A forfeiture, however, is not a waiver and does not necessarily end the matter. *See Russell*, 26 F.4th 371 at 374-75.

An argument forfeited in the district court by the government may still be considered by this Court if the government raises the argument in its opening brief and demonstrates that the "plain error" standard under Fed.R.Crim.Pro. 52(b) is met. *United States v. Noble*, 762 F.3d 509, 527-28 (6th Cir. 2014). The government has done the former. But it has not done the latter: the government's brief makes no mention of the "plain error" standard and makes no argument that it has been met. Thus, the

3

government has failed to adequately develop its argument that binding precedent bars Taylor's challenge. A perfunctory, undeveloped argument is deemed waived. *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007)("we require parties to develop their arguments in a non-perfunctory manner at the risk of having them deemed waived.").

**(B)    *Carey* did not establish binding precedent**

*Carey* did not establish binding precedent barring Taylor's Second Amendment challenge. The panel in *Carey* accepted the appellant's incorrect assertion that the Supreme Court in *District of Columbia v. Heller,* 554 U.S. 570 (2008), "specifically upheld firearm prohibitions for felons." 602 F.3d at 739. *Heller* did no such thing, and a binding precedent is not established where a panel simply accepts a party's incorrect concession on an issue. *Wright v. Spaulding*, 939 F.3d 695, 704 (6th Cir. 2019).

The source of the confusion is dicta in *Heller* found at 554 U.S. 626-27 & n. 26. The text in the body of the opinion is as follows:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[26]

4

554 U.S. at 626-27.

The text of footnote 26 in *Heller* is as follows:

We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.

554 U.S. at 627 n. 26.

There are two important points about this quoted language from *Heller*. First, this Court *en banc* recognized it as dicta in *Tyler v. Hillsdale Cty. Sheriff's Office*, 837 F.3d 678, 687 (6th Cir. 2016). Furthermore, the quoted language from *Heller* simply reiterates the oft-stated point that all statutes, both federal and state, are presumptively constitutional. *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944); *Freed v. Thomas*, 81 F.4th 655, 660 (6th Cir. 2023). Second, not only did the *Carey* panel mistakenly accept dicta as the Court's specific holding in *Heller*, it compounded the error by quoting only from the body of the opinion without quoting or acknowledging the caveat offered in *Heller*'s footnote 26.

The Court examined recently in *Wright v. Spaulding*, *supra*, when a panel opinion established a precedent binding on subsequent panels of the Court. As part of that discussion, the Court noted one instance where a binding precedent is not established: where "a party conceded an issue and

the panel took that concession at face value." 939 F.3d at 704. This is precisely what occurred in *Carey*: the appellant made an erroneous concession – that *Heller* "specifically upheld firearm prohibitions for felons" – and the panel took it at face value.

There are good reasons, the Court observed further in *Wright*, for caution where a prior panel has readily accepted a party's concession on an issue. "Appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983), *quoted* in *Wright*, 939 F.3d at 704. The Court further observed that "[i]t would be at least imprudent, and maybe improper, to make binding precedent out of a court's simple acquiescence in the parties' concessions and assumptions." *Id.*, *citing Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399-400 (1821); *Massachusetts v. United States*, 333 U.S. 611, 639-40 (1948)(Jackson, J., dissenting)("I see no reason why I should be consciously wrong today because I was unconsciously wrong yesterday.").

*Carey* presents the rare instance where a published decision does not establish a precedent binding on subsequent panels. Accordingly, even if the government had not waived the argument relying on it, *Carey* does not

6

establish binding precedent foreclosing Taylor's Second Amendment as-applied challenge to 18 U.S.C. § 922(g)(1).

**(C)    *Carey*'s vitality as binding precedent has been undermined in any event**

Even if *Carey* did stand once as binding precedent, its vitality as such has been undermined and superseded by the Supreme Court's decision in *Bruen, supra* and by this Court's *en banc* analysis and decision in *Tyler, supra*.

The Supreme Court's decision in *New York St. Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022), changed the landscape of Second Amendment law. First, *Bruen* abrogated the caselaw of every circuit that applied scrutiny to Second Amendment burdens. *United States v. Goins*, 647 F.Supp.3d 538, 543 (E.D. Ky. 2022). Second, "*Bruen* 'requires' [the Court] to interpret the Second Amendment in light of its original public meaning. *United States v. Daniels*, 77 F.4th 337, 341 (5th Cir. 2023), citing and quoting *Bruen* at 142 S.Ct. 2126, 2131. And divining that original public meaning demands a historical inquiry to determine if § 922(g)(1)'s application to Taylor "is consistent with the Nation's historical tradition of firearm regulation." 142 S.Ct. at 2130. Neither *Carey* nor any of the other non-published, non-precedential cases from this Court the government cites undertook this type of analysis. The Court recognizes that a prior

panel's binding decision must give way "when the prior panel's reasoning has been undercut or abrogated by a decision of the Supreme Court[,] [a]nd, ..., such Supreme Court authority need not be exactly on point, so long as the legal reasoning is directly applicable to the issue at hand." *United States v. White*, 920 F.3d 1109, 1113 (6th Cir. 2019), *cert. denied*, 140 S.Ct. 2667 (2020). The legal reasoning in *Bruen* is directly applicable to the issue at hand. Accordingly, to the extent that *Carey* ever was a binding precedent, it is not after *Bruen*.

Even before Bruen, this Court's *en banc* decision in *Tyler v. Hillsdale Co. Sheriff's Dept., supra*, put to rest any precedential status *Carey* once may have had. *Tyler* involved the other "longstanding" and "presumptively lawful" prohibition mentioned in the *Heller* dicta: possession of a firearm by the mentally ill. *See* 554 U.S. at 626-27 n. 26. The plaintiff in *Tyler* raised a Second Amendment challenge to 18 U.S.C. § 922(g)(4), which criminalizes firearm possession by an individual that "has been committed to a mental institution[.]" The district court dismissed the complaint "reasoning that *Heller*'s statement regarding 'presumptively lawful' prohibitions on the mentally ill foreclosed such claims." 837 F.3d at 681. Thus, the Court was obliged to consider and decide the import of the language in *Heller* that the panel in *Carey* had relied upon.

The Court held that the *Heller* dicta did not foreclose an as-applied challenge to a firearm regulation based on the Second Amendment. First, the Court observed that *Heller* merely "called the[ ] longstanding prohibitions [on possession of firearms by felons and/or mentally ill individuals] 'presumptively lawful.'" 837 F.3d at 686, *quoting Heller*. Furthermore, this Court cautioned that "in making this observation, the Court expressly noted that it was not 'clarify[ing] the entire field' of the Second Amendment, and, importantly, the Court reserved for later cases an exploration of the historical justifications for its enumerated prohibitions." *Id. quoting Heller*, 554 U.S. at 635. Accordingly, the Court concluded that "*Heller* only established a presumption that such bans were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis[,]" since a "presumption implies 'that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge.'" *Id*., 847 F.3d at 686, *quoting United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010). While it is true that *Tyler* involved firearm possession by a person with a history of mental illness, and this case involves firearm possession by a felon, both *Tyler* and this case require the Court to decide the import of the same language in *Heller*.  Given that, *Tyler* is best read as recognizing there must exist the possibility that the

9

felon-in-possession firearm ban could be unconstitutional in the face of an as-applied challenge such as presented by Taylor here. Coming after *Carey* and being an *en banc* decision *Tyler* supersedes *Carey* and allows the Court to consider afresh, especially in light of *Bruen*, Taylor's Second Amendment as-applied challenge to § 922(g)(1).

The government is correct that the Court in a number of unpublished, non-precedential cases, some of which relied on the mistakes in *Carey*, rejected Second Amendment challenges. The government is also correct that a number of district courts have relied on *Carey*, in full or part, to reject Second Amendment challenges to 18 U.S.C. § 922(g)(1) similar to that now presented by Taylor. These cases illustrate the "snowballing consequences" when a court accepts a party's erroneous concession on a point of law. *Wright*, 939 F.3d at 701. *Carey* well illustrates the wisdom of the observation in *Wright* that "[o]ur hands are not tied in a later case just because, in an earlier one, a party conceded an issue and the panel took that concession at face value." *Id.* at 704. Accordingly, the Court should reject the government's contention that Taylor's challenge to § 922(g)(1) is barred by *Carey*.

**2.    The Second Amendment protects an individual right distinguishable from "political" rights such as voting, jury service and holding public office, which require an individual to**

**act as part of a collective**

Contrary to the government's argument in point B of its brief (pp. 12-16), Taylor remains among "the people" covered by the Second Amendment, notwithstanding his felony convictions. The leading thrust of the government's argument is that felons may be barred from voting and other "political rights" such as jury service and holding public office, and, therefore, also from bearing arms. Govt. brief at 14-15. Although the terms is not used in the government's brief, its argument articulates what some have referred to as the "virtuous citizen" theory of the Second Amendment. Now Justice Barrett dismantled this argument in her dissent in *Kanter v. Barr*, 919 F.3d 437, 462-64 (7th Cir. 2019).

"While scholars have not identified eighteenth or nineteenth century laws depriving felons of the right to bear arms, history does show that felons could be disqualified from exercising certain rights—like the rights to vote and serve on juries—because these rights belonged only to virtuous citizens." 919 F.3d at 462 (Barrett, J., dissenting), *citing* Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 29 (1st ed. 1868) (explaining that certain classes of people were "almost universally excluded" from the franchise for "want of capacity or of moral fitness"); Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment*

*Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002) (identifying the "right to sit on juries" as "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner"). "On this view, the legislature can disarm felons because of their poor character, without regard to whether they are dangerous." Barrett dissent in *Kanter v. Barr*, 919 F.3d at 462 (Barrett dissent), *citing Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019).

One major problem with the government's argument "is that virtue exclusions are associated with civic rights – individual rights that 'require[ ] citizens to act in a collective manner for distinctly public purposes.'" Barrett dissent, 919 F.3d at 462, *quoting* Saul Cornell, *A New Paradigm for the Second Amendment*, 22 Law & Hist. Rev. 161, 165 (2004). Voting and jury service both require an individual to act "as part of [a] collective enterprise" of self-governance in the former and for the administration of justice in the latter. *Id*. at 462. Some scholars analogized the right to bear arms with these civic rights, when the right was mistakenly thought limited to participation in a well-regulated militia. *Id*.

The second problem with the government's argument is that "*Heller* … expressly rejects the argument that the Second Amendment protects a purely civic right." *Id*. at 463. *Heller* "squarely held that 'the Second

12

Amendment confer[s] an individual right to keep and bear arms,' and it emphasizes that the Second Amendment is rooted in the individual's right to defend himself – not in his right to serve in a well-regulated militia." *Id.* The government here, as in *Kanter v. Barr*, has presented no evidence or authority that "virtue exclusions ever applied to individual, as opposed to civic, rights." *Id.* "And if virtue exclusions don't apply to individual rights, they don't apply to the Second Amendment." *Id.*

History provides little support to the government. While ten states adopted constitutions that excluded or permitted the exclusion of felons from voting, and some early state legislatures barred felons from jury service, the state analogs of the Second Amendment do not explicitly limit the right to bear arms to virtuous citizens. Barrett dissent, 919 F.3d at 463-64. By 1820, nine states had enshrined the right to bear arms in their constitutions. *Id.* None of them made an exception for criminals. *Id.* Seven of these nine states included explicit limitations on criminals' right to vote in their constitutions. *Id.* Had early legislatures understood a virtue limitation to apply to the right to bear arms, they would have explicitly included it as they did with the voting franchise. *Id.* "Thus, although the right protected by the Second Amendment is not unlimited, its limits are

not defined by a general felon ban tied to a lack of virtue or good character." Barrett dissent, 919 F.3d at 464.

### 3.    The Court should not attribute an inconsistent meaning to "the people" as used in the Constitution

The government urges that "the term 'the people' need not bear precisely the same meaning in the Second Amendment that it does in other constitutional provisions that use the term." Govt. brief at 15-16. It offers that felons are "not among 'the people' who adopted the Constitution, or 'the [p]eople who are entitled to elect members of Congress, or 'the people' who reserved powers not delegated to the government." *Id.* (citations omitted). And, therefore, the government urges, neither is Taylor, a felon, among the people covered by the Second Amendment. Similar arguments were considered and rejected by the *en banc* Third Circuit in *Range v. Attorney General*, 69 F.4th 96 (2023), which relied heavily on Justice Barrett's dissent in *Kanter v. Barr, supra*.

The Third Circuit noted that the Constitution references "the people" "twice with respect to voting for Congress," and recognizes them "as having rights to assemble peaceably, to petition the government for redress, and to be protected against unreasonable searches and seizures." 69 F.4th at 101-02. However, "[u]nless the meaning of the phrase "the people" varies from provision to provision—and the Supreme Court in *Heller* suggested it does

14

not—to conclude that Range is not among 'the people' for Second
Amendment purposes would exclude him from those rights as well." *Id*. at
102, *citing Heller*, 554 U.S. at 580. "And we see no reason to adopt an
inconsistent reading of 'the people.'" 69 F.4th at 102. Neither should this
Court.

The Third Circuit acknowledged that an individual with Second
Amendment rights may be denied possession of a firearm and agreed with
Justice Barrett's reasoning in *Kanter v. Barr* that the better analytical
approach was to consider when a legislature may constitutionally strip an
individual of their rights. *Id*. We turn again to that discussion.

Justice Barrett acknowledged in *Kanter v. Barr* that "[t]here are
competing ways of approaching the constitutionality of gun dispossession
laws," "one uses history and tradition to identify the scope of the right, and
the other uses that same body to evidence to identify the scope of the
legislature's power to take it away." 919 F.3d at 452. It is more than a
matter of semantics.

The court in *United States v. Goins*, 647 F.Supp.3d 538 (E.D. Ky.
2022), discussed the odd results that the approach urged by the
government – defining Taylor completely out of the Second Amendment –
could yield. "If some people fall entirely outside of the Second

Amendment's scope, then no state action would be required to disarm them." *Id.* at 547, *citing* Barrett dissent in *Kanter*, 919 F.3d at 452. Suppose, the court continued, "a law under which Congress chooses to disarm DUI convicts for ten years." 647 F.Supp.3d at 547. If such a person is not among "the people" covered by the Second Amendment, he could find himself twenty years after his DUI conviction beyond the period for which Congress sought to disarm him yet he would still lack Second Amendment rights." *Id. citing* Barrett dissent, 919 F.3d at 452. The government's approach would erode Congress's capacity to make public policy consistent with the Constitution.

The approach urged by the government is inconsistent with other contexts involving the loss of a right, when "state action determines the scope of the loss (subject, of course, to any applicable constraints)." Barrett dissent, 919 F.3d at 452-53. A good example is voting rights: felons can have their voting rights removed, if their state chooses to do so; but if the state does not do so, their voting rights remain constitutionally protected. *Id.* at 453. A parallel approach makes sense for the right to keep and bear arms: "a person convicted of a qualifying crime does not automatically lose his right to keep and bear arms but instead becomes eligible to lose it." *Id.*

The Court, consistent with the analyses of the *en banc* Third Circuit in *Range*, and Justice Barrett's dissent in *Kanter v. Barr*, should reject the government's argument.

### 4.    The Supreme Court did not rewrite the Second Amendment to protect only "law-abiding" individuals

The government also attempts to preempt Taylor's challenge to § 922(g)(1) by arguing that the Supreme Court, by way of dicta in *Heller* and *Bruen*, has limited the Second Amendment only to those deemed "law-abiding." Govt. brief at 17-19. A similar argument was rejected by the *en banc* Third Circuit in *Range*.

The Third Circuit recited four grounds to reject this rewrite of the Second Amendment proposed by the government. First, the criminal histories of the plaintiffs in *Heller*, *Bruen*, and also in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the third of the Supreme Court's major Second Amendment cases in the last two decades, were not at issue, so the references to "law-abiding, responsible" citizens was mere dicta. 69 F.4th at 101. Second, the Third Circuit was not inclined to overread these dicta because doing so would require "the people" covered by the Second Amendment to be inconsistent with "the people" referred to elsewhere in the Constitution. *Id.* at 102.

17

Third, the proper analytical approach is to determine whether an individual's Second Amendment rights may be constitutionally stripped, not to conclude preemptively that they have been forfeited. For this, the Third Circuit cited and quoted one of its earlier *en banc* Second Amendment cases, *Binderup v. Attorney General,* "[t]hat individuals with Second Amendment rights may nonetheless be denied possession of a firearm is hardly illogical." 69 F.4th at 102, *quoting* 836 F.3d 336, 344 (3rd Cir. 2016)(Ambro, J.), *cert. denied*, 582 U.S. 943 (2017). It also agreed with Justice Barrett's "dissenting opinion in *Kanter v. Barr*, in which she persuasively explained that 'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right.'" *Id., quoting* 919 F.3d at 452.

Finally, "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague." 69 F.4th at 102. The Third Circuit pondered if it could exclude recipients of traffic tickets from the Second Amendment, whether it distinguished between felons and misdemeanants, noting the Supreme Court's recent observation that "'a felon is not always more dangerous than a misdemeanant.'" *Id.*, *quoting*, *Lange v. California*, 141 S. Ct. 2011, 2020 (2021). Furthermore, such an approach would grant extreme deference to the legislature to define the scope of the Second Amendment, which would

countermand "*Heller*'s reasoning that 'the enshrinement of constitutional rights necessarily takes certain policy choices off the table.'" 69 F.4th at 102, *quoting* 554 U.S. at 636 and also *citing*, *Bruen*, 142 S.Ct. at 2131 (warning against "judicial deference to legislative interest balancing").

The Court should, as did the *en banc* Third Circuit, reject the government's contention that Supreme Court dicta has removed Taylor from the Second Amendment.

**5.    *Bruen* requires the government to show a "distinctly similar" historical analogue to the application to Taylor of 18 U.S.C. § 922(g)(1)**

The government's contention, Govt. brief at 33-35, that it is required only to identify a "relevantly similar" historical analogue instead of a "distinctly similar" one is incorrect. This argument is contrary to a straight-forward reading of *Bruen*. Furthermore, the Fifth Circuit in *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023), observed that *Bruen* provided "two conceptual pathways" depending on whether the regulation addressed a chronic problem dating back to the 18th century or an unprecedented or dramatically new problem or development.

The relevant language in *Bruen* articulating the first of these "two conceptual pathways" is as follows:

> The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are

19

consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, *the lack of a distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.

142 S.Ct. at 2131 (emphasis added).

Neither time nor technology nor social problems stand still or remain static, of course, and so the Court in *Bruen* recognized that a second and looser analytical approach should be applied where "unprecedented societal concerns" or "dramatic technological changes" that were unforeseeable to the Founders were at issue:

> While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. ... Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

142 S. Ct. at 2132.

The "two conceptual pathways" indicated by *Bruen* are as follows: (1) if the regulation aims at a problem extant in and persisting since the 18th century, the government must identify "distinctly similar" historical analogues to support the challenged law's constitutionality; and, (2) if the regulation has been occasioned by "unprecedented societal concerns or dramatic technological changes" the government need only show a "relevantly similar" historical analogue. This is the Fifth Circuit's conclusion in *Daniels* and its analysis is helpful

In *Daniels*, the Fifth Circuit considered the constitutionality of 18 U.S.C. § 922(g)(3), which bars an individual from possession a firearm if he is an "unlawful user" of a controlled substance. *Bruen* required two steps, the court explained, the first being whether the Second Amendment's plain text applied to the individual conduct, and the second "requir[ing] both close attention to history and analogical reasoning." 77 F.4th at 341. As to how a historical tradition of comparable gun regulation could be identified, "*Bruen* helpfully [provides] two pathways." *Id*. at 342. The Fifth Circuit explained these two pathways as follows:

> If the modern regulation addresses "a general societal problem that has persisted since the 18th century," then "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131. But if a modern law addresses "unprecedented societal concerns or

dramatic technological changes," it calls for a "more nuanced approach." *Id.* at 2132. We must reason by analogy to determine whether older regulations are "relevantly similar" to the modern law. *Id.*

77 F.4th at 342.

Taylor is not offering a unique or innovative reading of *Bruen*, which, as the Fifth Circuit concludes correctly, offers "two conceptual pathways" to consider a challenged regulation, the choice depending on whether it aims at an old or new problem or issue. The government's contention to the contrary is without merit. Furthermore, the government does not contend that this case involves or presents either "unprecedented societal concerns or dramatic technological changes." Accordingly, to sustain its burden, the government is required to identify "distinctly similar" historical analogues to § 922(g)(1)'s application to Taylor. As seen herein and in Taylor's main brief, the government has failed.

## 6. History does not support the proposition that felons lose their Second Amendment rights because of their status as felons

Contrary to the government's contentions that Taylor's felon status forfeits his Second Amendment rights, "[h]istory does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons." *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019)(Barrett, J., dissenting). The government urges that felons in the

22

Founding era were subject to the death penalty and/or estate forfeiture, and, therefore, being subject to these penalties greater than disarmament, there is a historical tradition that supports Taylor's disarmament and prosecution. These arguments also were dismantled by Justice Barrett in her *Kanter v. Barr* dissent. 647 F.Supp.3d at 550-51. The *en banc* Third Circuit also rejected them in *Range v. Attorney General, supra*.

"The premise of [the government's] argument—that the states permanently extinguished the rights of felons, either by death or operation of law, in the eighteenth and nineteenth centuries—is shaky." Barrett dissent, 919 F.3d at 458. "While it accurately describes the punishment of felons at English common law, the American picture is far more complex." *Id.* "During the period leading up to the founding, the connection between felonies and capital punishment started to fray." *Id.* at 459. "Throughout the seventeenth and eighteenth centuries, capital punishment in the colonies was used 'sparingly,' and property crimes including variations on theft, burglary, and robbery 'were, on the whole, not capital.'" *Id.*, *quoting* Lawrence M. Friedman, *Crime and Punishment in American History* 42 (1993). "By the time the Constitution was ratified, James Wilson observed that while the term 'felony' was once 'very strongly connected with capital punishment,' that was no longer true." 919 F.3d at 459, *quoting* John D.

23

Bessler, *Cruel & Unusual* 52–53 (2012)(further citation and quote omitted). While many crimes remained eligible for the death penalty, that varied from state to state; in sum, death no longer inevitably followed a felony conviction. 919 F.3d at 459.

History shows that the shift in punishment for felonies was matched by a shift in the meaning of civil death, which had been previously connected to a capital sentence. *Id*. "As courts hammered out the incongruities between civil death and continued life over the next century, they settled uncomfortably on an American version of civil death that required explicit statutory authorization and deprived a felon of many, but not all, rights." *Id*. at 461, *citing Avery v. Everett*, 18 N.E. 148, 154-55 (N.Y. 1888)(suggesting that a life convict maintained a right to defend an action brought against him and certain property rights, including the ability to transfer property by will or deed). As to those felons serving less than a life sentence, the cases began to hold "that the rights of felons serving less than life were merely *suspended* during the term of the sentence." 919 F.3d at 461, *citing In re Estate of Nerac*, 35 Cal. 392, 396 (1868) ("If the convict be sentenced for life, he becomes *civiliter mortuus*, or dead in law.... If, however, he be sentenced for a term less than life, his civil rights are only suspended during the term."); *Ruffin v. Commonwealth*, 62 Va. 790, 796

24

(1871) (explaining that a convict is "*civiliter mortuus,*" but only "[f]or the time being, during his term of service in the penitentiary"); *Bowles v. Habermann*, 95 N.Y. 246, 247 (1884) (applying a statute, which provided that "a sentence of imprisonment in a State prison for any term less than for life … suspends, during the term of the sentence, all the civil rights … of, or held by, the person sentenced.").

The lesson of this history is that the consequences of a felony conviction were not as categorically severe as the government urges. Barrett dissent, 919 F.3d at 461 . Capital punishment was "less pervasive than" the government urges and "civil death applied exclusively to life sentences and only if authorized by statute—and even then, it was more modest than the ancient version because the convict retained some rights." *Id.* Felons serving a term of years did not suffer civil death; their rights were suspended but not destroyed." *Id.* While felons in the Founding era were stripped of some rights, "history confirms that the basis for the permanent and pervasive loss of all rights cannot be tied generally to one's status as a convicted felon or to the uniform severity of punishment that befell the class." *Id.* at 461.

The Third Circuit rejected the government's attempts to analogize Founding era statutes imposing the death penalty to the situation of the

plaintiff before it. "That Founding-era governments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Range*, 69 F.4th at 105. "The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Id.* Furthermore, in the Founding era, a felon could "repurchase arms" after successfully completing his sentence and reintegrating into society, as both the majority and a dissent in *Range* noted. *Id.*; 69 F.4th at 127-28 (Krause, J., dissenting).

The government's argument that history tells us that Taylor's status as a felon forfeited his Second Amendment rights is without merit. The Court should reject it.

### 7. The Government's contention that the Second Amendment grants Congress "broad legislative authority" to decide to disarm those deemed "dangerous" is contrary to *Bruen* and without merit

The government contends that some disarmament measures "reflect broad legislative authority," Govt. brief at 23, and urges further that a variety of laws and failed resolutions at state constitutional ratification conventions show that broad authority could be exercised to disarm those

deemed dangerous. Govt. brief at 23-32. The district court also relied on a general concept of dangerousness. The Fifth Circuit considered and rejected a similar sweeping argument in *Daniels, supra.*

The Fifth Circuit in *Daniels* assumed that "the Second Amendment encodes some government power to disarm the dangerous[.]" 77 F.4th at 353. It saw two problems with what it characterized as the government's "dangerousness principle." *Id.* First, granting the legislature broad authority to designate a group of persons as "dangerous" and disarm them would permit Congress to "claim that immigrants, the indigent, or the politically unpopular were presumptively 'dangerous' and eliminate their Second Amendment rights without judicial review." *Id.* The *en banc* Third Circuit made a similar observation in *Range v. Attorney General* and further noted that such "deference would contravene Heller's reasoning that 'the enshrinement of constitutional rights necessarily takes certain policy choices off the table.'" 69 F.4th at 103, *quoting* from 554 U.S. at 636.

Second, *Bruen* forbids courts from "balancing a law's justifications against the burden it places on rightsholders." 77 F.4th at 353, *citing* 142 S.Ct. at 2127. The example the Fifth Circuit discussed was "a state legislature [that] disarms all men, citing statistics that men commit more violent crimes than do women." 77 F.4th at 353 n. 39, *citing* FBI statistics

that in 2012, "approximately 80% of offenders arrested for violent crimes were men." This example is materially indistinguishable from the statistical evidence that the government discusses in its brief at pages 43-46 to justify Taylor's disarmament and his prosecution under § 922(g)(1). "But *Bruen* forswears that kind of review." 77 F.4th at 353, *citing* 142 S.Ct. at 2129.

The solution, one recognized by the Fifth Circuit in *Daniels* and one, in all fairness, partially recognized by the government, "is to analogize to particular regulatory traditions instead of a general notion of 'dangerousness.'" *Id*. at 354. The key questions, the Fifth Circuit elaborated, consistent with Bruen's "why" and "how" analysis are as follows:

> *Why* was the group considered dangerous at the Founding and therefore disarmed? And *why* does the modern law classify a person as presumptively dangerous? Is the comparison supported by the record? Furthermore, *how* did the historical regulation limit the rights of the dangerous class? And *how* does the modern regulation do so?

77 F.4th at 354.

The government's theory of danger-based disarmament falls apart when this framework is applied. As in *Daniels*, "[t]he government identifies no class of persons at the Founding (or even at Reconstruction) who were 'dangerous' for reasons comparable to" Taylor. *Id*. at 354. Nonviolent felons like Taylor are not "a class of political traitors, as British Loyalists were perceived to be." *Id*. "Nor are they like Catholics and other religious

28

dissenters who were seen as potential insurrectionists." *Id.* And even if the Court were to consider the detestable racially discriminatory laws extant at the Founding and later, Taylor "is not like the minorities who the Founders [and many state governments] thought threatened violent revolt." *Id.*

The government does no better by its reliance on the English Militia Act of 1662 or the drafts of the Second Amendment that were considered by various state conventions but did not make it into text. Those notions, "at the time of the Founding, ... referred specifically to violence or rebellion, not generalized public harm." *Daniels*, 77 F.4th at 354. And § 922(g)(1) "is not limited to those with a history of violent behavior" – not all" alcoholics or drug users are violent and the "government has not shown how [Taylor's convictions] predisposes him to armed conflict or that he has a history of" violence because of either. *Id.*

The Court is required by *Bruen* to determine whether the historical record contains "distinctly similar" laws that disarmed felons on account of their status as a nonviolent felon. There is no such record.

The question presented here is narrow. The issue here is whether the Second Amendment allows Taylor to possess while in his home a firearm for self-defense. The government is required to identify a "distinctly similar" historical analogue showing he may not; it has failed. Indeed, the

government has failed to contravene the assertion that American law has historically observed a "zone of immunity" for "the people" surrounding their private ownership and possession of firearms in the home. Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 142 (2007).

## Conclusion

For all the foregoing reasons, the judgment of the district court should be vacated and reversed and the indictment ordered dismissed.

Respectfully Submitted,

By: /s/ Robert L. Abell
ROBERT L. ABELL
120 North Upper Street
Lexington, KY 40507
COUNSEL FOR APPELLLANT
TRENTON LAYNE TAYLOR

**Certificate of Service**

I hereby certify that the foregoing was electronically filed with the Sixth Circuit's electronic filing system this 8th day of February 2024, that notice will be sent electronically by that system to All Counsel of Record.

/s/ Robert L. Abell
COUNSEL FOR APPELLANT

**Certification of Compliance
Pursuant to FRAP 32(a)(7)(B)**

This reply brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B)(ii) because this brief contains 6,487 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(f).

/s/ Robert L. Abell
COUNSEL FOR APPELLANT